927 F.2d 74
 George HURLMAN, Ruth Hurlman, Patricia Rice, Individually
and as the Maternal Parent of Jillian Rice, an
Infant, under the age of Fourteen years,
Plaintiffs-Appellees,
v.
Charles W. RICE, Jr., Chester E. Nelson, Hector E. Pagan,
Damon Mangual, Terrence P. Dwyer, Gregory Porteus
and Timothy Knapp, Defendants,
Chester E. Nelson, Hector E. Pagan, Damon Mangual, Terrence
P. Dwyer, Gregory Porteus and Timothy Knapp,
Defendants-Appellants.
 No. 851, Docket 90-7518.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 8, 1991.
Decided March 4, 1991.
 
 Thomas A. O'Keefe, Peekskill, N.Y., for plaintiffs-appellees.
 Marilyn T. Trautfield, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Kathie Ann Whipple, Deputy Bureau Chief, New York City, on the brief), for defendants-appellants.
 Before KEARSE, WINTER, and ALTIMARI, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Chester E. Nelson, Hector E. Pagan, Damon Mangual, Terrence P. Dwyer, Gregory Porteus, and Timothy Knapp appeal from an order of the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge, denying their motion pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the amended complaint ("complaint") on the ground of, inter alia, qualified immunity. The complaint, brought principally under 42 U.S.C. Sec. 1983 (1988), charges appellants with wrongful, forcible entry of the home of plaintiffs George and Ruth Hurlman and the unlawful seizure of plaintiff Jillian Rice. The district court denied appellants' motion for summary judgment without comment. On appeal, appellants contend principally that the court erred in denying their motion and in doing so without explanation. For the reasons below, we conclude that the district court's order is not appealable, and we dismiss the appeal for lack of appellate jurisdiction.
 
 I. BACKGROUND
 
 2
 The present litigation, centering on events occurring between approximately 11:30 p.m. on November 1 and 1 a.m. on November 2, 1986, has its origin in a controversy between plaintiff Patricia Rice and her estranged husband, defendant Charles W. Rice, Jr. ("Charles Rice"). Plaintiffs George Hurlman ("Hurlman") and Ruth Hurlman are Patricia Rice's parents; the then-four-year-old plaintiff Jillian Rice ("Jillian") is the daughter of Patricia Rice and Charles Rice. Charles Rice is or was a Westchester County, New York police officer; the six appellants are or were New York State Police Troopers.
 
 
 3
 The complaint alleges that at approximately midnight on the night in question, several of the appellants (the "troopers"), went to the Hurlmans' home, entered without consent, and forcibly seized custody of Jillian. The troopers represented that they had a Westchester County Family Court order giving them authority to remove Jillian from the premises. Upon demand, they produced a family court order to show cause that required Patricia Rice to show why she should not be enjoined from residing with Jillian at the home of her parents and temporarily restrained her from residing there with Jillian until further order of the court. The draft order presented to that court had contained a provision that would have given Charles Rice immediate temporary custody of Jillian; that provision had been stricken by the judge. Plaintiffs, protesting that the order did not provide for any summary removal of Jillian from the Hurlmans' home, asked the troopers to summon their superior officer. The troopers refused, forced their way into the Hurlmans' home, and threatened the Hurlmans and Patricia Rice with immediate arrest if they sought to interfere with the troopers' removal of Jillian from the premises. The troopers forced Patricia Rice to awaken and dress Jillian; they then took the child and delivered her to Charles Rice.
 
 
 4
 On November 6, 1986, Jillian was returned to her mother pursuant to an order of the family court. Plaintiffs commenced the present action in 1987, alleging that appellants had acted pursuant to a conspiracy between themselves and Charles Rice and had violated plaintiffs' constitutional rights, including the right to be free of unlawful entry into the home and the rights of mother and daughter not to be forcibly separated. They seek compensatory and punitive damages.
 
 
 5
 In their answer, appellants deny that they acted improperly. Though they admit that "Charles Rice was present during some of the relevant time," they deny having conspired with him. They also deny having entered the Hurlman home forcibly, deny having threatened plaintiffs in any manner, and deny having committed any other improper act or omission with respect to the events alleged in the complaint.
 
 
 6
 After a period of discovery, appellants moved for summary judgment dismissing the complaint on grounds of, inter alia, qualified immunity. The thrust of the qualified-immunity branch of the motion was that Charles Rice had been concerned for the welfare of his daughter because, in April 1985, Hurlman had been convicted of an offense involving endangering the welfare of a child and had been given a probationary sentence that included a prohibition against Hurlman's having contact with his two other grandchildren; that the troopers dispatched to the Hurlman home had not entered forcibly but had entered with consent; that the troopers had not threatened anyone with arrest; and that Patricia Rice herself had voluntarily delivered Jillian to Charles Rice who went there with the troopers. In support of these assertions, appellants submitted their own affidavits and excerpts from various depositions.
 
 
 7
 The affidavit of Porteus revealed that he and Charles Rice had been friends for some 12 years and that sometime after Porteus went off duty at 11 p.m. on November 1, 1986, Rice had come to the State Police barracks seeking help in removing Jillian from the Hurlmans' home. At his deposition, Porteus could not recall whether or not he had read the family court's order to show cause; he recalled that Charles Rice was concerned for the welfare of his daughter.
 
 
 8
 The affidavit of Knapp, the barracks desk officer from 11 p.m. on November 1 to 7 a.m. on November 2, stated that Knapp had read the family court order brought to the barracks by Charles Rice and had discussed it with Porteus, Nelson, and Pagan. Knapp thereupon dispatched Nelson, Pagan, Dwyer, and Mangual to the Hurlmans' residence to remove Jillian from the premises. His affidavit stated that
 
 
 9
 [a]lthough the Court order did not specifically direct the State Police to intervene in any dispute, I believed that there was a reasonable risk of violence if Mr. Rice went to the Hurlman residence on his own to remove Jillian Rice from the residence. In addition, I had overheard Mr. Rice and Trooper Porteus talking about the possibility that there were weapons in the Hurlman residence and about George Hurlman's history of deviant sexual behavior toward one or more of his daughters.
 
 
 10
 Knapp felt that sending the troopers was "the safest way to execute the Court order."
 
 
 11
 Appellants' statement pursuant to Local Rule 3(g), setting forth material facts as to which they contended there was no genuine issue to be tried, included the statement that "Troopers Dwyer and Mangual did not force their way into the residence, but entered with permission, either express or implied." In support of this assertion, Dwyer stated in his affidavit that after arriving at the Hurlmans' home,
 
 
 12
 I was standing inside the house. Although I was not specifically invited inside, at no time was I told not to come inside or that I was trespassing and had no authority to be there.
 
 
 13
 Likewise, Mangual stated in his affidavit,
 
 
 14
 I was standing inside the house, approximately ten to twelve feet from the front door. Although I had not been specifically invited inside, at no time had I been told not to come inside or that I was trespassing and had no authority to be there.
 
 
 15
 Further, according to Mangual, "[n]either Trooper Dwyer nor I directed Mrs. Rice to turn the child over to us. Trooper Dwyer did not tell Mrs. Rice to go upstairs to get the child." Trooper Dwyer merely followed Patricia Rice upstairs when she went to get the child, in accordance with "standard practice not to let anyone out of your sight when responding to a family situation." The affidavits of both Dwyer and Mangual stated that the troopers did not threaten Patricia Rice or Hurlman with arrest. Rather, both stated that "she agreed to relinquish the child to Mr. Rice." Appellants' attorney's affidavit in support of the motion concluded that "the overwhelming evidence demonstrates that the troopers did not threaten either Patricia Rice or George Hurlman with immediate 'forcible arrest' that evening." The affidavits of Knapp, Dwyer, and Mangual stated that each "further believed that the terms of the Court order provided ... authority, if necessary, to remove Jillian Rice from the Hurlman residence."
 
 
 16
 In opposition to the motion for summary judgment, plaintiffs controverted virtually all of appellant's principal assertions. Disputing appellants' Rule 3(g) statement that the troopers had "entered [the Hurlmans' home] with permission, either express or implied," Patricia Rice testified at her deposition precisely to the contrary. She stated that she had objected to the troopers' entering the house, saying, "You can't come in." At his deposition, Hurlman testified that he was "blocking the door," and that Dwyer brushed past him and went upstairs. Further, Hurlman submitted an affidavit stating that
 
 
 17
 four uniformed police officers came to my home and upon my property, without permission. They forced their way into my home and forcibly removed Jillian, terrorizing my wife, daughter and myself.
 
 
 18
 I was prevented from attempting to stop them and was humiliated in front of my family because police threatened to arrest my entire family.
 
 
 19
 I gave no permission, express or implied, for the uniformed defendants to come onto my property or into my house. They arrogantly forced their way in.
 
 
 20
 I gave no permission, express or implied, for defendant Dwyer or any other defendant to go upstairs to my daughter's bedroom and forcibly remove Jillian. I told the police defendants to leave my property and they refused.
 
 
 21
 Both Hurlman and Patricia Rice testified that Dwyer threatened to arrest them if they did not hand over Jillian. Patricia Rice testified that Dwyer "told me that if I didn't let them take Jillian, to go up and take Jillian, that they would arrest my parents, me, everybody in the house." She testified that Dwyer told her she must give Jillian to Charles Rice, who was waiting outside. She felt she had no choice but to comply.
 
 
 22
 Plaintiffs also submitted documents indicating that the offense of which Hurlman had been convicted was giving his seven-year-old grandson "documents of a sexual nature which might be deleterious to their sexual development" (People v. Hurlman, plea hearing, February 19, 1985), to wit, a Reader's Digest article on how to stop child prostitution. Plaintiffs also quoted the family court judge at the November 6, 1986 hearing as expressing outrage at the actions of Charles Rice and the troopers in seizing Jillian on November 2, and as allowing Patricia Rice to live with Jillian in the Hurlmans' home until further order of the court.
 
 
 23
 The district court denied appellants' motion for summary judgment without comment. Appellants moved for reconsideration, contending that the court had not considered their qualified immunity and other arguments. The court denied this motion too without elaboration. This appeal followed.
 
 II. DISCUSSION
 
 24
 On appeal, appellants contend that they were entitled to summary judgment on the ground that, as police officers, they enjoy qualified immunity from the present suit and that the district court erred both in denying their motion and in failing to state the basis for the denial. For the reasons below, we dismiss the appeal for lack of appellate jurisdiction.
 
 
 25
 The qualified immunity enjoyed by police officers protects them against a suit for damages " 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' " Robison v. Via, 821 F.2d 913, 920 (2d Cir.1987) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)), or, where the rights were clearly established, insofar as it was objectively reasonable to believe that their acts did not violate those rights, see Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); Malley v. Briggs, 475 U.S. 335, 344, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986); Robison v. Via, 821 F.2d at 921. The latter ground has its principal focus on the particular facts of the case. It may nonetheless permit the granting of summary judgment to the defendants if they adduce sufficient uncontroverted facts that, even looking at the evidence in the light most favorable to the plaintiffs and drawing all inferences favorable to the plaintiffs, no reasonable jury could conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did not violate an established federally protected right. See id.
 
 
 26
 The district court's denial of a motion for summary judgment dismissing a claim on the basis of qualified immunity is an appealable "final decision" within the meaning of 28 U.S.C. Sec. 1291 only to the extent that it turns on an issue of law. See Mitchell v. Forsyth, 472 U.S. 511, 528-30, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); Mahoney v. Hankin, 844 F.2d 64, 68-69 (2d Cir.1988). Where the adjudication of the immunity defense requires resolution of a question of fact, the denial of the motion to dismiss is not immediately appealable.
 
 
 27
 Appellants' qualified immunity defense rested on two premises: first, that appellants did not take any action without plaintiffs' consent; and second, that it was objectively reasonable for them (a) to believe that the family court order to show cause authorized them to seize Jillian and (b) to enforce that order in light of Hurlman's past offense. We conclude that the district court's denial of their motion for summary judgment is not appealable because both of appellants' arguments rested on factual premises that are genuinely disputed.
 
 
 28
 There can be no doubt that it was established prior to November 1986 that the Fourth Amendment guarantees an individual the right to be secure against forcible entry of his home save in exceptional circumstances, see generally Payton v. New York, 445 U.S. 573, 584-90, 100 S.Ct. 1371, 1378-82, 63 L.Ed.2d 639 (1980); United States v. Manning, 448 F.2d 992, 1000-02 (2d Cir.) (en banc), cert. denied, 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971), and that "seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. at 586, 100 S.Ct. at 1380. Further, it was established that, except where emergency circumstances exist, as discussed below, a parent's interest in the custody of his or her children is a constitutionally protected "liberty" of which he or she may not be deprived without due process, generally in the form of a predeprivation hearing. See Robison v. Via, 821 F.2d at 921; see generally Stanley v. Illinois, 405 U.S. 645, 649-58, 92 S.Ct. 1208, 1211-16, 31 L.Ed.2d 551 (1972).
 
 
 29
 Appellants contended first that they did not violate these rights because they took no action to which plaintiffs did not consent. Thus, they asserted that the troopers entered the Hurlmans' home with consent, that the troopers did not threaten to subject any of the plaintiffs to arrest, and that Patricia Rice voluntarily agreed to relinquish Jillian to Charles Rice. These factual assertions, however, were sharply disputed in accordance with Fed.R.Civ.P. 56(e). Thus, in their depositions and/or affidavits, Hurlman and Patricia Rice stated under oath that they had not consented to the troopers' entry, that they asked the troopers to stay out, and that the troopers threatened them with arrest if they did not hand over Jillian. Plaintiffs' sworn assertions suffice here to raise a genuine issue of fact for trial. It is also noteworthy that there is support for plaintiffs' version in the blotter entry made by Mangual on his return to the state police barracks after leaving the Hurlmans' home. He noted that Jillian had been "taken" and handed over to Charles Rice. Though Mangual indicated in his affidavit that he wished he had chosen his words more carefully, his uncounseled description is evidence from which a jury could well infer that plaintiffs' version of the facts is the more accurate.
 
 
 30
 Appellants' second argument was that it was objectively reasonable for them to do whatever was necessary to seize Jillian, including entering the Hurlmans' home forcibly, either (a) because the family court order gave them that authority, or (b) because Hurlman's past offense made that advisable. To the extent that appellants meant the first part of this argument to assert that they had the right to enter the Hurlmans' home to seize Jillian even if no emergency circumstances existed, it is doctrinally unsound. The family court's order to show cause was directed toward Patricia Rice and placed a temporary restraint on her. It was not an order to the police to enforce her compliance, and in light of the established constraints on law enforcement officers executing far more intrusive orders such as arrest warrants, see Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (officers possessing an arrest warrant for one individual are not entitled, without a search warrant, consent, or exigent circumstances, to enter the home of another for purposes of executing the arrest warrant), appellants could not objectively have viewed the family court's temporary restraint of Patricia Rice as a blanket authorization for them to enter the Hurlmans' home.
 
 
 31
 To the extent that appellants contended that Hurlman's offense record, with or without consideration of the family court order, gave them authority to enter the Hurlmans' home to seize Jillian forcibly and without consent, their position rested again on disputed factual issues. In light of a parent's constitutionally protected "liberty" interest in the custody of his or her children, see Stanley v. Illinois, 405 U.S. at 649-58, 92 S.Ct. at 1212, officials may remove a child from the custody of the parent without consent or a prior court order only in "emergency" circumstances. See generally Robison v. Via, 821 F.2d at 921. Emergency circumstances mean circumstances in which the child is immediately threatened with harm, id. at 922, for example, where there exists an "immediate threat to the safety of the child," Sims v. State Department of Public Welfare, 438 F.Supp. 1179, 1192 (S.D.Tex.1977) (three-judge court), rev'd on other issues sub nom. Moore v. Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), or where the child is left bereft of care and supervision, Duchesne v. Sugarman, 566 F.2d 817, 825-26 (2d Cir.1977), or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence, Lossman v. Pekarske, 707 F.2d 288, 291-92 (7th Cir.1983).
 
 
 32
 Appellants rely on Robison v. Via for the proposition that their actions were permissible as a matter of law. Their reliance is doubly misplaced. First, in Robison there was no material factual dispute as to the nature of the defendants' actions in seizing the children or as to the information those defendants possessed. Second, the nature of the information given to the Robison defendants was markedly different from what these appellants may have known. The Robison defendants had been informed that one of the children had repeatedly been subject to physical sexual abuse by her father for three years and that the other child had been repeatedly beaten, and the defendants had interviewed the children's mother and knew that she would not protect the children. Thus, the reported harm to the Robison children was physical and was ongoing, and there was no room for any inference that there was not an emergency situation.
 
 
 33
 Here, there are factual questions, first, as to precisely what information any of the appellants had. Knapp, who dispatched the troopers, stated that he had read the family court order to show cause, but the order did not mention Hurlman's history, and Knapp did not suggest either at his deposition or in his affidavit that he had read Charles Rice's affidavit in support of the order or that he was otherwise familiar with the circumstances. Rather, Knapp stated merely that he had overheard Rice's conversation with Porteus which Knapp recalled as indicating that Hurlman had engaged in deviant sexual behavior with one or more of Hurlman's own daughters. So far as the record shows, however, Porteus has no recollection of such an assertion. Rather, Porteus, who may have discussed Hurlman's record with Charles Rice, testified that he did not recall whether he had read the family court order; he could recall little of the substance of his conversation with Charles Rice, except that Rice was concerned for the welfare of Jillian, had therefore obtained the family court order, thought Hurlman might react violently if Rice were to go to the Hurlmans' home, and wanted the State Police to assist him in order to avoid problems. Dwyer, one of the troopers dispatched to the Hurlmans' home, apparently was aware that Hurlman had been convicted of "an offense involving endangerment to a child," but there is no indication in the record that he or any of the other appellants had any precise information as to Hurlman's actual record.
 
 
 34
 Further, there are factual questions both as to whether it was objectively reasonable for Knapp to dispatch the troopers on the basis of what he overheard or thought he overheard without further investigation, and as to whether the offense of which Hurlman had in fact been convicted made it objectively reasonable for appellants to believe that Jillian was in imminent danger. Porteus, who probably possessed the greatest knowledge, apparently had no belief that Patricia Rice would not protect her daughter, and he appeared to have some question in his own mind as to whether any danger to Jillian was imminent. Thus, when questioned at his deposition as to whether his conversation with Charles Rice led him to believe that Jillian was "in any imminent danger," Porteus's response was:
 
 
 35
 A. Are you talking about that moment or are you talking about a day from then? Are we talking about 24 hours from then? Are we talking about a week from then?
 
 
 36
 You have to be more specific. Obviously, if the baby was sleeping in the same room with her mother, I can't see it being in imminent danger.
 
 
 37
 Q. Well, I am talking about the facts as they existed at that time or the circumstances as they existed at that time. And I am talking about the conversation that you were having with Charles Rice at that time, at the State Police barracks, sometime around midnight. That's the time frame that I'm talking about....
 
 
 38
 ....
 
 
 39
 A. Like I answered it before, you have to be--the concern would be when the child would be in imminent danger. When Patti left for work the next morning? Whatever.
 
 
 40
 Whenever the child could be in a position to be possibly victimized by the father-in-law, that's what he was concerned with.
 
 
 41
 None of the appellants have represented that they had received reports of physical abuse by Hurlman of any of his grandchildren, and the affidavits submitted by Dwyer and Mangual suggest a lack of both knowledge of and concern for whether or not on the night of November 1 any threat to Jillian was imminent or of emergency proportions. Thus both stated the view that "where it is alleged that someone in the household has a history of conduct constituting sexual abuse or endangerment of a child, there is always a possibility of danger to any other child who is present." (Emphasis added.) This statement may be true; but its truth would hardly make it objectively reasonable to believe that the circumstances were exigent. If the mere "possibility" of danger constituted an emergency, officers would "always" be justified in making a forced entry and seizure of a child whenever the child was in the presence of a person who had such a history.
 
 
 42
 Further, there is at least a question of fact as to whether Hurlman's conviction for showing his seven-year-old grandchild a Reader's Digest article on how to halt child prostitution could have provided an objectively reasonable basis for believing that Jillian, in the presence of her mother, was in such immediate danger as to warrant the midnight invasion of the Hurlmans' home.
 
 
 43
 In sum, on the present record, when reasonable inferences are drawn in favor of the plaintiffs as the non-moving parties, there are plainly factual questions as to what actually occurred, what information the officers had, and whether the facts were sufficient to permit an objectively reasonable belief that harm to Jillian was imminent. Since there are questions of fact to be answered in order to determine whether appellants are entitled, on any of their theories, to a defense of qualified immunity, the district court's order denying their motion for summary judgment is not a final judgment and is not appealable.
 
 
 44
 Appellants point out that the district court made no explicit statement as to its reasons for denying their motion to dismiss on qualified immunity grounds, and they request that we remand to the district court to allow it to make such a statement. We decline to do so. Though it is of course preferable to have some statement from the court as to the reasons for its denial of a substantial motion, we have a certain sympathy for the court's desire to deny summarily a summary judgment motion where the record clearly reveals a plethora of material issues of fact. Thus, while we have stated that where the district court has not addressed a defense of qualified immunity our general practice is to remand for further consideration, see Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir.1988), and we have followed that practice where it appears to us that the qualified immunity issue was appropriate for determination on summary judgment, see Musso v. Hourigan, 836 F.2d 736, 742 & n. 1 (2d Cir.1988) (stating that qualified immunity defense should be decided on summary judgment), or where there was no reason to believe the court found there were issues of fact, see Francis v. Coughlin, 849 F.2d 778, 780 (2d Cir.1988) (per curiam) (defense had been raised in a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), on which the allegations of the complaint must be taken as true), we see no need to remand for such consideration where the record plainly reveals the existence of genuine issues of material fact relating to the qualified immunity defense.
 
 
 45
 As discussed above, the record plainly reveals that there are such issues here. In the circumstances, it would be a jejune exercise to remand to the district court for the ritual articulation of the obvious.
 
 CONCLUSION
 
 46
 The appeal is dismissed for lack of appellate jurisdiction. Standard costs to plaintiffs.