# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-3295

_____

Wayne King,

    Plaintiff - Appellee,

v.

Charles Beavers,

    Defendant - Appellant.

    \*   Appeal from the United States
    \*   District Court for the
    \*   Western District of Arkansas.

_____

Submitted: February 13, 1998
Filed: July 9, 1998

_____

Before LOKEN and HANSEN, Circuit Judges, and DAVIS,[*] District Judge.

_____

LOKEN, Circuit Judge.

Wayne King filed this 42 U.S.C. § 1983 action against Deputy Sheriff Charles Beavers, alleging that Beavers violated King's Fourteenth Amendment right to liberty in enforcing a guardianship order. Beavers appeals the district court's denial of his motion for summary judgment on qualified immunity grounds. We reverse.

_____

[*]The HONORABLE MICHAEL J. DAVIS, United States District Judge for the District of Minnesota, sitting by designation.

# I.

To review the denial of a pretrial qualified immunity motion, we accept as true the facts alleged by King, the non-moving party. See Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998). In November 1995, Wayne King was seventy-seven years old. He lived with his invalid wife, Bonnie, who could not walk or talk and required constant care. Betty Tudor, an Arkansas Department of Human Services Consultant, became concerned by King's refusal to admit home health care aides. She visited the Kings' home and found them living in what she considered deplorable conditions.[1] Before recommending that the State of Arkansas petition for custody of Mr. and Mrs. King, Tudor contacted their only daughter, Marilyn Johnson, a California resident.

Johnson came from California and began staying with the Kings on November 10. On November 17, at Tudor's urging, Johnson sought the advice of an attorney and petitioned the Johnson County Probate Court for her appointment as guardian of the persons and estates of Mr. and Mrs. King. The petition was supported by a letter from Clarksville physician Jack T. Patterson stating that King was "probably significantly depressed and perhaps is a threat to both himself and to his wife." On November 21, after notice to King (which he claims he did not receive), the court held a hearing and issued an order finding that Wayne and Bonnie King were incapacitated, appointing Marilyn Johnson guardian of their persons and estates, and directing the Clerk of Court to issue Letters of Guardianship to Marilyn Johnson of Paicines, California. Johnson then filed a guardian's bond, and the Clerk issued Letters of Guardianship reciting that Johnson was "authorized to have the care and custody of and to exercise control over

---

[1]Tudor made two trips to the Kings' home in early November 1995. In a July 1997 affidavit, Tudor averred that the Kings spent most of the day sleeping, King fed his wife mostly cereal, Mrs. King was incontinent and the bedroom reeked of urine, Mr. King seemed upset by visitors, and Mrs. King seemed confused and in poor health. The Department of Health stopped home health services on November 7 because King would not admit health aides to care for his wife. King does not dispute these averrals.

the person and to take possession of and administer the property of [Wayne and Bonnie King] as authorized by law."

On November 29, Johnson County Sheriff Charles Nicklas received a call from the King residence advising that Betty Tudor was having problems because Mr. King would not obey the court order appointing Marilyn Johnson guardian. Sheriff Nicklas sent Deputy Beavers to the King residence to assist Tudor. Beavers arrived and reviewed the guardianship order and Letters of Guardianship. He discussed the matter with Tudor, Johnson, and home health care workers and then tried to persuade Mr. King to get out of his bed. When King refused, Beavers contacted Johnson County Attorney Bruce Wilson, who said Beavers should try to persuade King to go with his daughter to California.[2] Beavers returned to King and tried to persuade him to leave with Johnson. King refused, repeatedly stating, "I will kill myself," and saying he hoped his wife would die as well. Beavers again contacted Wilson, who advised that Beavers should physically remove King from the home if necessary. After a final unsuccessful attempt at persuasion, Beavers picked King up and carried him to the front door. At that point, King said: "Put me down. I will walk. What are the neighbors going to think?" King walked to the patrol car and rode to a nearby medical clinic, where Johnson arranged for him to receive a shot.

At the clinic, Johnson told Beavers she needed assistance getting the Kings to the Little Rock airport and then to California. Beavers called Sheriff Nicklas, who said Beavers could take King to Little Rock and could accompany Johnson and the Kings to California if there was no expense to Johnson County. Beavers then called County Attorney Wilson, who said he saw no problems with these proposed actions. Beavers drove the group to the Little Rock airport and then accompanied Johnson and the Kings

---

[2]Unbeknownst to Beavers, Wilson was also the private attorney representing Marilyn Johnson in the guardianship proceeding. While this apparent conflict of interest is disturbing, it does not affect Beavers's claim to qualified immunity.

on their plane ride to California. This travel took place without incident. Johnson paid for Beavers's plane ticket and paid him $430 for assisting her on the trip to California. Beavers took the next flight back to Arkansas.

In February 1996, Johnson voluntarily terminated Mr. King's Arkansas guardianship and California temporary conservatorship after an investigator concluded that King was able to care for himself. In March, King returned to Arkansas, and Mrs. King died shortly thereafter. An embittered King filed this action in November 1996 against his daughter and Beavers. The district court denied Beavers's motion for summary judgment on qualified immunity grounds, explaining:

> Had Beavers merely assisted Johnson, who had a court order and letters of guardianship giving her custody and control over both her father and his possessions, with removing King from the home, our conclusion would undoubtedly be different. Additionally, our conclusion might be different had Beavers, in reliance on the advice of the prosecuting attorney and the sheriff, merely assisted in transporting King to the airport at Johnson's request. However, here Beavers went farther -- he went outside not only the county in which he had authority or jurisdiction to act but went outside the state. . . . We agree with King that these acts were not objectively reasonable.

Beavers appeals. We have interlocutory jurisdiction to consider issues of law raised by the denial of a pretrial qualified immunity motion. See Murphy v. State of Ark., 127 F.3d 750, 753 (8th Cir. 1997). We review the denial of qualified immunity *de novo*.

## II.

Qualified immunity protects government officials from damage liability unless their discretionary acts violated clearly established statutory or constitutional rights. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity guards

against the injustice of subjecting public officials to damage liability for the good faith performance of discretionary duties they are legally obligated to undertake, and the danger that the threat of such liability will deter officials from performing with the decisiveness and judgment the public good requires. See Scheuer v. Rhodes, 416 U.S. 232, 241-42 (1974). Qualified immunity protects all but the plainly incompetent and those who willingly violate the law. See Malley v. Briggs, 475 U.S. 335, 341 (1986). We conclude Beavers is entitled to qualified immunity for two distinct reasons.

No Clearly Established Federal Right. To recover under 42 U.S.C. § 1983, King must prove that Beavers violated King's constitutional rights while acting under color of state law. To avoid a claim of qualified immunity, the right alleged must be "clearly established," that is, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). When qualified immunity is asserted in a § 1983 action, we "determine first whether the plaintiff has alleged a deprivation of a constitutional right at all," and if so, "whether the right allegedly implicated was clearly established at the time of the events in question." County of Sacramento v. Lewis, 118 S. Ct. 1708, 1714 n.5 (1998). King's claim founders on these issues, which the district court barely discussed in its otherwise lengthy opinion.

King argues that Beavers "falsely imprisoned [King], denying him his constitutional right to liberty." False imprisonment is a state law tort claim. It is not coextensive with the Fourteenth Amendment, which "protects only against deprivations of liberty accomplished 'without due process of law.'" Baker v. McCollan, 443 U.S. 137, 145 (1979). For example, the constitutional right to liberty is not violated if the State takes custody of a citizen following a judicial determination that he is unable to care for himself or is a serious risk to the safety of himself or others. Compare O'Connor v. Donaldson, 422 U.S. 563 (1975), with Jackson v. Indiana, 406 U.S. 715, 738 (1972). Here, the Johnson County Probate Court's guardianship order was of a similar nature, except that it ordered King into the custody of a private guardian, his

daughter Marilyn Johnson. King does not, and in our view could not, argue that enforcement of the guardianship order violated his substantive due process right to liberty.[3]

Instead, King argues that "no objectively reasonable officer would have believed that the guardianship order and Letters of Guardianship gave him authority to remove the ward to California." In other words, King's entire claim is based upon the proposition that the Fourteenth Amendment required a *second* court order before guardian Johnson, with the assistance of state actors such as DHS Consultant Tudor, County Attorney Wilson, Sheriff Nicklas, and Deputy Beavers, could move the unwilling King from his home to his legal guardian's place of residence. Of course, the proper scope and import of the probate court's guardianship order and Letters of Guardianship are questions of state law. Yet neither King nor the district court cited Arkansas authority supporting King's contention, nor attempted to explain why any such violation of state law would amount to a federal constitutional deprivation.

There is apparently no Arkansas case law on the question whether a facially unlimited guardianship order grants the guardian the power to change an unwilling ward's place of residence, and more particularly, to move the ward out of state. The few cases we have found from other states tend to contradict King's position:

---

[3]Nor does King argue the order violated his right to procedural due process; in any event, such a claim would not give rise to a cause of action against Beavers. King's complaint did generally plead violations of the First, Fourth, and Fifth amendments, but he has not argued those claims on appeal. Cf. Sellers v. Baer, 28 F.3d 895, 898 n.4 (8th Cir. 1994), cert. denied, 513 U.S. 1084 (1995). Because Beavers physically seized King in his home, it is likely that "any liability must turn on an application of the reasonableness standard governing searches and seizures." County of Sacramento, 118 S. Ct. at 1715. However, analysis of this case under the Fourth Amendment would not lead us to a different conclusion.

> In this country the decisions uniformly hold the guardian may change the residence of the ward, whether infant or lunatic, to another state, if this be done in good faith and for the best interest of his ward, especially when with the consent or approval of the court appointing the guardian.

In re Waite, 180 N.W. 159, 161 (Iowa 1920); see generally 39 C.J.S. *Guardian & Ward* § 60 (1976).

Nor does a review of the pertinent Arkansas statutes lend support to King's contention. The guardian is "entitled to the custody of the ward." ARK. CODE ANN. § 28-65-301(a)(3). If the court decides that the guardian's powers should be limited, it "shall set forth the specific powers, authorities, and duties the guardian shall possess," § 28-65-214(d); here, Johnson's guardianship order conferred unlimited custodial powers. Changing the ward's residence is not among a statutory list of guardian decisions that always require prior court approval. See § 28-65-302. But one of the grounds for terminating an Arkansas guardianship is "[i]f the ward becomes a nonresident of this state,"§ 28-65-401(b)(2) -- express legislative recognition that guardians may effect a change of residence. Finally, in this case, the guardianship order expressly recited that the guardian was a resident of California, a clear signal that the probate court knew a change of King's residence was implicit in appointing Johnson guardian.

In sum, King has no support for his assertion of a Fourteenth Amendment liberty deprivation. In denying Beavers qualified immunity, the district court relied on Hurlman v. Rice, 927 F.2d 74, 79-80 (2d Cir. 1991). But that was a Fourth Amendment decision premised upon the court's conclusion that an order to show cause directed to a child's *mother* in no way authorized police officers to seize the child from her *grandparents'* home. This case is very different. Based upon our review of the relevant Arkansas statutes, confirmed by what little case law there is elsewhere in the country, we conclude that the probate court's guardianship order implicitly included the

power to change the ward's residence to that of the guardian. Therefore, DHS Consultant Tudor, the County Attorney, the County Sheriff, and Deputy Beavers did not violate King's Fourteenth Amendment rights by helping to escort him, involuntarily but peacefully, to the guardian's residence in California without additional authorization from the probate court. Beavers is entitled to summary judgment dismissing this § 1983 action because he did not violate King's constitutional rights by removing King from his home, escorting King to the Little Rock airport, and accompanying King and Johnson to California.

      B. Objectively Reasonable Conduct. Alternatively, we conclude that Beavers's conduct was objectively reasonable, that is, it "did not violate clearly established rights of which a reasonable person would have known." Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996).[4] Beavers went to the King home at the direction of Sheriff Nicklas to assist DHS Consultant Tudor. He reviewed a court order and Letters of Guardianship placing King in Johnson's custody and control. He was advised by Tudor that King should accompany Johnson to California. When King resisted, threatening to kill himself, Beavers consulted the County Attorney and later the Sheriff and acted consistently with their advice. He used minimal force in assisting King's daughter and legal guardian to move King and his invalid wife to the daughter's home. While King's law enforcement expert opined that it was unreasonable for Beavers to travel far outside his jurisdiction in assisting Johnson, that issue has nothing to do with whether the trip violated King's clearly established constitutional rights.

---

[4]There is some support in our prior cases for the proposition that Beavers is entitled to quasi-judicial absolute immunity because he was carrying out a facially valid court order. See Robinson v. Freeze, 15 F.3d 107, 109 (8th Cir. 1994); Patterson v. Von Riesen, 999 F.2d 1235, 1239 (8th Cir. 1993); Tymiak v. Omodt, 676 F.2d 306, 308 (8th Cir. 1982). However, qualified immunity is the norm. The absolute immunity issue has not been raised, and we do not consider it.

Given the traumatic situation Beavers encountered, the instructions from his superiors, and his wide-ranging responsibilities as an Arkansas law enforcement officer, see ARK. CODE ANN. § 14-52-203, Beavers undoubtedly would have been remiss -- and would have faced uncertain liability -- had he arrived at the King residence and failed to take reasonable action to pacify the feuding family members. Some months later, Mr. King's custodial guardianship proved to be unnecessary and was terminated. But the guardianship order was facially valid. Beavers was duty bound to help enforce that order, and his actions in that regard were objectively reasonable because they were consistent with the court's grant of full guardianship to Marilyn Johnson. Public officials facing situations like this must take quick and decisive action to mitigate risks to health and safety. This is precisely the kind of good faith discretionary official action that qualified immunity is intended to protect. Compare Miller v. Compton, 122 F.3d 1094, 1099 (8th Cir. 1997).

The order of the district court denying the motion of defendant Charles Beavers for summary judgment is reversed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-9-