TRAXLER, Circuit Judge,
dissenting:
At the time Justin and Jaime were removed from Gayle Martin’s custody, clearly established substantive due process principles prohibited government officials from removing a child from the custody of his or her parent without either prior judicial authorization or evidence that the child faced an imminent risk of harm to his or her health and well-being if the parent maintained custody. Viewed in the light most favorable to Martin, including the reasonable inferences to be drawn therefrom, the record before us shows that Alexis Zoss directed the removal of Justin and Jaime from Martin’s custody, even though no court had ordered it and nothing suggested the children were in imminent danger from abuse or neglect. Particularly troubling is the removal of Jaime, who was not even of school age and who remained in the sole legal and physical custody of Martin — there was no reason conceivable for her to be taken. I believe it is erroneous to require Martin to prove that Zoss made misrepresentations to the Los Angeles Department of Social Services (“LADSS”). In my view, Martin can prove that Zoss infringed upon her funda *508 mental liberty interest in the custody and control of her children through Martin’s evidence that there was no factual or legal basis for Zoss to direct the removal of the children. The taking of children from their parents by a government official without reason is unquestionably egregious and arbitrary conduct. Evidence that Zoss used a misrepresentation to gain custody might strengthen Martin’s claim, but it is not essential to Martin’s claim. Consequently, I find no deficiency in Martin’s proof even if there is a lack of direct evidence as to a misrepresentation by Zoss.
Moreover, I find no evidence of any miscommunication between Zoss and LADSS, which the district court offered as a possible theory for the unexplained removal of the children. Zoss submitted an affidavit to the district court, but in it she says nothing about what LADSS was told and she offers no justification whatsoever for the seizure of the children.
I therefore must respectfully dissent from the conclusion that Zoss is entitled as a matter of law to qualified immunity on Martin’s substantive due process claim. I would vacate that portion of the district court’s order and remand so that Martin could continue to pursue this cause of action.
I.
In January 1997, the St. Mary’s Department of Social Services (“SMDSS”) received a Child Protective Services referral alleging that Justin had missed over half of his first grade school year. Justin, who suffered from asthma, had been placed in the school’s Chronic Health Impaired Program (“CHIPS program”) which provided weekly home visits by a school tutor. According to school officials, however, the home tutors were only able to establish very limited direct contact with Justin. Kathleen Coulby, an SMDSS employee, began investigating the referral and learned school officials were concerned that many of Justin’s absences were not genuinely linked to his health problems. Coulby was informed that because Justin had never been taught on a regular basis, the school had been unable to assess his learning disabilities. Coulby eventually spoke to Martin, who denied that Justin had missed an untoward amount of school. Nevertheless, Martin agreed to submit Justin to a mental health evaluation conducted by Dr. Heidi Daniels. Dr. Daniels, whose conclusions are not part of the record submitted to the panel, apparently determined that Justin’s chronic absences from school resulted in “mental injury.” J.A. 90.[1] No such determination was made regarding Jaime who, at 18 months of age, was far too young to attend school. SMDSS does not suggest that Justin and Jaime were being physically abused or neglected or that they were at risk of physical abuse or neglect.
Based on Coulby’s investigation, SMDSS petitioned for an order declaring both Justin and Jaime to be Children in Need of Assistance (“CINA”), and, pending a hearing on the merits of the CINA petition, removing them from the home and placing them in shelter care with SMDSS.[2] The *509 CINA petition sought the same relief for both children even though there were no specific allegations regarding why the state was entitled to remove the younger child, Jaime, from her mother.
On May 14, 1997, a juvenile master held a hearing to determine whether Justin and Jaime should be removed and placed into temporary shelter care. SMDSS called as a witness Susan Joyce, a social worker who, based on 90 minutes of observation, testified that she believed Justin “[was] suffering from neglect, mental injury.” J.A. 74. No evidence or testimony was presented in support of SMDSS’s assertion that Jaime should be taken from her mother — the evidence and testimony focused exclusively on Justin. The master concluded that Justin’s “[cjontinuation in the home is not contrary to [his] welfare,” J.A. 55, and permitted Martin to retain physical custody of Justin. However, the master granted legal custody of Justin to SMDSS pending the final disposition of the CINA petition, and ordered Martin to “make a good faith effort to ensure Justin [’s] ... attendance [at] school.” J.A. 56. The master also required that the family undergo a “family psychological evaluation” and that Martin attend an “individual counseling and/or a parenting/child development class in an effort to better understand the developmental and educational needs of a child.” J.A. 56. The master did not grant any portion of SMDSS’s petition with respect to Jaime.
After the shelter care hearing, Dr. James Lewis, whom SMDSS listed as its expert witness, performed the psychological evaluation and concluded that “[d]e-spite the psychological data which suggests that Justin has not been provided ordinary and proper care sufficient to make age and grade-level educational and psychosocial progress,” Justin was “very positively and closely bonded to his mother and sister, such that he would be psychologically harmed if the next remedy implemented is removal from his parental home.” J.A. 99. Moreover, Dr. Lewis noted that Jaime was also “very closely and positively bonded” to Martin and would be “hurt psychologically” by removal from the parental home. J.A 95. These findings were set forth in a report dated July 29, 1997, which was provided to Coulby.
The adjudication hearing on the CINA petition was set for August 28, 1997. In late July, however, Martin decided to move with her children across the country to Los Angeles, California. According to Martin, she informed Coulby and two additional SMDSS employees of the move, as well as family members in Maryland. Coulby went on maternity leave about this time and had no further involvement with the case; Zoss, Coulby’s supervisor, apparently assumed an active role in the Martin case. Upon arriving in Los Angeles, the Martin family temporarily settled into a community shelter, and Justin began attending school nearby. Martin filed a formal change of address with the United States Postal Service and obtained a California identification card. She also notified SMDSS of her new address in California.
According to Martin’s unrefuted affidavit, on October 9, 1997, at 10:45 p.m., social workers with LADSS appeared unannounced at the shelter where the Martins were living and demanded custody of Justin and Jaime, who were sleeping. The social workers were accompanied by police *510 officers. LADSS informed Martin that a court in Maryland had issued an order authorizing the removal of Justin and Jaime from her and that the children were to be flown to Maryland the following day where they would remain in the custody of SMDSS. Martin eventually permitted the children to be taken only after she became convinced that SMDSS had indeed obtained such a court order and that she risked arrest if she did not cooperate. LADSS took Justin and Jaime crying and screaming from their mother and held them until the next night.
Zoss does not dispute that she directed LADSS to take the Martin children. It is also undisputed that there was no court order directing that Justin or Jaime be removed from their mother’s physical custody. Moreover, there was no emergency at the time that placed the children in “serious immediate danger,” Md.Code Ann., Cts. & Jud. Proc. § 3-815(b), and Zoss does not suggest otherwise. Zoss nevertheless directed that the Martin children be removed without prior notice or a hearing, as required by Maryland law in a nonemergency. See Md.Code Ann., Cts. & Jud. Proc. § 3-815.
On the following day, Zoss “called [Martin] twice ... and threatened to keep the children and have [Martin] arrested if [she] did not return to Maryland for the adjudication hearing,” J.A. 108, which had been rescheduled for the next week. Martin contacted her attorney in Maryland who filed an emergency motion in Maryland circuit court seeking the immediate return of Justin and Jaime. The attorney appointed to represent the interests of the children also believed that the children should be returned immediately to Martin because she perceived no emergency or other “factual or legal basis for removing the children from their mother on October 9, 1997.” J.A. 111. Zoss disagreed, insisting that the removal had been appropriate because the case involved “ ‘mental injury.’ ” J.A. 112. At the emergency hearing, however, SMDSS agreed to direct LADSS to return the children. At 11:00 p.m. on October 10, Justin and Jaime were returned to their mother. Martin subsequently filed a motion to dismiss the underlying CINA petition, which SMDSS agreed to do.
Martin filed this § 1983 action against Coulby and Zoss, in their official and individual capacities, as well as SMDSS. The district court accepted Martin’s view of the evidence but awarded qualified immunity to Zoss because, in its view, Martin failed to demonstrate that the constitutional right at issue was clearly established. Also, the court concluded that Martin’s claim against Zoss failed because there was no support in the record for her claim that Zoss made misrepresentations to LADSS. I cannot agree.[3]
II.
Social workers performing discretionary functions, as Zoss was here, are protected by qualified immunity “ ‘insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” White by White v. Chambliss, 112 F.3d 731, 735 (4th Cir.1997) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). To determine whether Zoss is entitled to qualified immunity, we follow a two-step analytical process. Before considering the qualified *511 immunity question, we must decide if Martin has alleged the deprivation of a constitutional or statutory right. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). That inquiry requires us to determine whether, “[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show [that] the [official’s] conduct violated a constitutional right.” Id. If so, then we proceed to the second task, which “is to ask whether the constitutional right was clearly established in the specific context of the case.” Figg v. Schroeder, 312 F.3d 625, 635 (4th Cir.2002) (internal quotation marks omitted); see also Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).
A. Constitutional Violation
The Fourteenth Amendment’s directive that “[n]o State shall ... deprive any person of life, liberty, or property, without due process of law” prohibits “certain government actions regardless of the fairness of the procedures used to implement them.” County of Sacramento v. Lewis, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal quotation marks omitted). Thus, the Due Process Clause of the Fourteenth Amendment “guarantees more than fair process” and “includes a substantive component that provides heightened protection against government interference with certain fundamental rights.” Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (internal quotation marks omitted).
The core of the concept of substantive due process is the “protection of the individual against arbitrary action of government,” Lewis, 523 U.S. at 845, 118 S.Ct. 1708 (internal quotation marks omitted), i.e., protection against “the exercise of power without any reasonable justification in the service of a legitimate governmental objective,” id. at 846, 118 S.Ct. 1708. The substantive component of the Due Process Clause limits arbitrary government action whether such power is exercised by a legislative body or by an individual member of the executive branch, and the application of substantive due process review differs based on what kind of governmental action we are reviewing. See id. at 847 n. 8, 118 S.Ct. 1708.
If, as is the case here, our focus is on a purported abuse of executive power rather than the propriety of a legislative enactment, “only the most egregious official conduct can be said to be arbitrary in the constitutional sense.” Lewis, 523 U.S. at 846, 118 S.Ct. 1708 (internal quotation marks omitted). Thus, “the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.” Id. at 847 n. 8, 118 S.Ct. 1708; see United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). “[T]he kind of executive conduct that fairly can be said to shock the conscience ... involves abusing executive power, or employing it as an instrument of oppression.” Hawkins v. Freeman, 195 F.3d 732, 742 (4th Cir.1999) (en banc) (internal quotation marks and alteration omitted). In considering whether the conduct at issue qualifies as conscience-shocking, we look to see if “history, tradition and precedent demonstrate[ ] that the right asserted was one entitled to substantive due process protection.” Id. at 739.
“[T]he interest of parents in the care, custody, and control of their children” has been described as “perhaps the oldest of the fundamental liberty interests recognized” by the Supreme Court. Troxel, 530 U.S. at 65, 120 S.Ct. 2054; see Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Prince v. Massachu *512 setts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The Supreme Court has consistently reaffirmed that the contours of substantive due process apply to him in the state’s power to interfere with a parent’s right to custody and control of her child. See Troxel, 530 U.S. at 66, 120 S.Ct. 2054 (“In light of th [e] extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.”).
This fundamental right is not absolute, however. “The parent’s right to custody is subject to the child’s interest in his personal health and safety and the state’s interest as parens patriae in protecting that interest.” Chambliss, 112 F.3d at 735. In cases involving a pre-hearing removal of children from parental custody by state officials, we have concluded that substantive due process is satisfied when the caseworker has “some evidence of child abuse” or a reasonable basis to suspect the child is in immediate danger of serious harm. Weller v. Dep’t of Soc. Servs. for Baltimore, 901 F.2d 387, 391-92 (4th Cir.1990) (applying the shocks-the-conscience test); see Chambliss, 112 F.3d at 736-37 (holding that caseworker acted within the bounds of substantive due process where there was evidence of abuse and where the statutory precondition that the child be in danger was satisfied); cf. Jordan by Jordan v. Jackson, 15 F.3d 333, 343 (4th Cir.1994) (“[I]t is well-settled that the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child.”). The converse, it seems to me, is self-evident — a state official runs afoul of a parent’s fundamental liberty interest in the care, custody and control of her child when the official removes the child without any reason to believe the child is suffering abuse or is in imminent danger of serious harm. I am hard pressed to think of executive conduct that is more arbitrary or abusive. See, e.g., Suboh v. District Attorney’s Office of Suffolk, 298 F.3d 81, 92-93 (1st Cir.2002); Brokaw v. Mercer County, 235 F.3d 1000, 1019 (7th Cir.2000); Hatch v. Dep’t for Children, Youth & Families, 274 F.3d 12, 20-24 (1st Cir.2001); Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1126 (3d Cir.1997); Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir.2000); Hurlman v. Rice, 927 F.2d 74, 79 (2d Cir.1991).
Based on the sparse record, Martin’s version of events is literally unrefuted and, in my view, recounts conduct by Zoss that was wholly arbitrary and satisfies the stringent “shocks the conscience” standard. For me, the key is in Zoss’s failure, for whatever reason, to supply any justification at all, let alone to identify evidence of child abuse or imminent danger, for having the children (Jaime in particular) removed from Martin. The record is simply devoid of any evidence from which I can conclude that Zoss’s decision to have these children removed was not capricious. Everyone — from the attorneys serving as guardians ad litem for the children to Zoss herself, apparently — agrees that there was no emergency. There was no evidence that Justin or Jaime had ever been abused or physically neglected or that they were in imminent peril of any nature. Indeed, Zoss was fully aware that the juvenile court in Maryland, after a plenary investigation by SMDSS, had refused to remove Justin from the physical custody of his mother. And, SMDSS’s assertion that Jaime had been neglected evidently had so little merit that the court did not even expressly address it. Zoss knew, or reasonably should have known, that following the initial shelter care hearing, SMDSS’s *513 own expert witness examined Justin and concluded that to take him away from his mother would actually result in a net detriment, not benefit, to Justin.
Patricia Jackson’s unrefuted affidavit provided that, as guardian ad litem, she was informed by Carole Coursey, counsel for SMDSS, that “[SMDSS] had attempted to gain the cooperation of the California authorities ... to conduct a home visit of the Martin children for three weeks without success.... Ms. Coursey described her client as telling LADSS ‘to take the children.’ ” J.A. 111. Thus, another reasonable inference is, as Martin asserted in her motion to dismiss the CINA petition, that Zoss “intended solely to manipulate and coerce the Los Angeles County Department of Children’s Services into assigning a higher priority to the request.” J.A. 119.
About the only substantial fact highlighted by defense counsel to show that Zoss’s conduct was objectively reasonable is that Martin moved from Maryland to California while the final hearing on the CINA petition was still pending. This is uncontested, but I fail to see how it helps Zoss. Zoss nowhere says that the move motivated her actions, nor explains how the move created circumstances requiring removal of the children. To the extent Zoss’s attorney offers this fact post hoc to suggest that Martin had illegally fled the jurisdiction, Martin has created an issue of fact in this respect. It is undisputed that Martin informed SMDSS of her intention to move more than two months prior to the hearing date. After arriving in California, Martin obtained a California identification card, enrolled Justin in school, and notified SMDSS of her new address, which hardly suggests that she was ducking the authorities. And, I find nothing to suggest that SMDSS told Martin she was required to stay in Maryland. Additionally, at the very least, even if Martin was trying to distance her family from SMDSS, SMDSS had no authority to force Martin to keep the younger child Jaime, for whom shelter care was denied, in Maryland.
In sum, I cannot imagine more arbitrary conduct. Zoss has not pointed to a single fact that justifies the extra-judicial removal of Martin’s children. I therefore have no difficulty finding that such conduct is of a kind that shocks the conscience and that Martin has sufficiently alleged a violation of her rights guaranteed by the substantive component of the Due Process Clause of the Fourteenth Amendment.
B. Clearly Established Law
The next question is “whether the established contours of the [Fourteenth] Amendment were sufficiently clear [in October 1997] to make it plain to reasonable [officials] that their actions under these particular circumstances violated [Martin’s] rights.” Winfield v. Bass, 106 F.3d 525, 531 (4th Cir.1997) (en banc). In determining whether the right in question was clearly established, we must define “the right allegedly violated ... at the appropriate level of specificity.” Wilson, 526 U.S. at 615, 119 S.Ct. 1692. This does not mean that “the exact conduct at issue [must] ... have been held unlawful for the law governing an officer’s actions to be clearly established.” Amaechi v. West, 237 F.3d 356, 362 (4th Cir.2001). Rather, our analysis must take into consideration “not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.” Id. at 362-63 (internal quotation marks omitted). The right must be defined “in such a way as to provide notice to a reasonable person in the official’s position that his conduct violated the identified right.” Id. at 363.
*514 In light of our caselaw in October 1997, and that of a number of other jurisdictions, I cannot accept the notion that Zoss could have reasonably believed her actions were lawful. We have clearly stated, on more than one occasion, that a social worker can remove a child from the parent’s physical custody without getting prior court approval only when the caseworker is acting in an alleged emergency situation. See Weller, 901 F.2d at 391-92 (reviewing a removal effected by a caseworker who was provided evidence of child abuse); Chambliss, 112 F.3d at 736-37 (same). Although our decisions have not affirmatively stated that substantive due process forbids the removal of a child from his parents without prior judicial approval in a non-emergency and where there is no evidence of serious danger, that principle is clear from our statements in Weller and Cham-bliss. And, although we have not precisely determined the outer contours of what constitutes an emergency, our recognition that a pre-hearing removal is proper when there is some evidence of child abuse at a minimum makes clear that a caseworker can assume custody of a child without court approval only if the caseworker has some articulable basis for doing so. Here, we have been pointed to nothing that could be considered a justifiable basis.
Moreover, I believe that a number of other precedents made it clear in October 1997 that Zoss’s conduct was impermissible under the Due Process Clause of the Fourteenth Amendment. See, e.g., Croft, 103 F.3d at 1126; Manzano v. South Dakota Dep’t of Soc. Servs., 60 F.3d 505, 511 (8th Cir.1995); Caldwell v. LeFaver, 928 F.2d 331, 333 (9th Cir.1991); Hurlman, 927 F.2d at 80.
Accordingly, I would reverse the district court as to Martin’s claim that Zoss violated her fundamental right to physical custody of her children free from arbitrary state interference. I would return this particular claim to the district court for further proceedings. I respectfully dissent.

. Maryland law defines “mental injury” as "the observable, identifiable, and substantial impairment of a child’s mental or psychological ability to function.” Md.Code Ann., Cts. & Jud. Proc. § 3-801(r).

. "Shelter care” is "temporary placement of a child [who is alleged to be a CINA] outside of the home” until a final decision can be made on the merits of the CINA petition. Md.Code Ann., Cts. & Jud. Proc. § 3-815(f)(2)(ii). A judicial hearing is required before SMDSS can put a child into shelter care, but SMDSS may place a child in "emergency shelter care” prior to obtaining a court *509 order “to protect the child from serious immediate danger.” See Md.Code Ann., Cts. & Jud. Proc. § 3-815(b)(1).

. SMDSS was dismissed from the action and Martin does not seek review of that ruling. The record contains unrefuted evidence that Coulby’s involvement in the Martin case ended prior to October 9, 1997, when the children were removed. Accordingly, I would affirm the district court’s grant of summary judgment to Coulby.