07-4449-cv (L)
Southerland v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: April 21, 2009          Decided: June 10, 2011)

Docket Nos. 07-4449-cv (L), 07-4450-cv (CON)

-------------------------------------

SONNY B. SOUTHERLAND, SR., individually and as parent and natural guardian of VENUS SOUTHERLAND, SONNY B. SOUTHERLAND, JR., NATHANIEL SOUTHERLAND, EMMANUEL FELIX, KIAM FELIX, and ELIZABETH FELIX,

Plaintiffs-Appellants,


- v -

CITY OF NEW YORK, TIMOTHY WOO, JOHN DOES 1-9,

Defendants-Appellees.*

-------------------------------------

Before:    KEARSE, SACK, and HALL, Circuit Judges.

Consolidated appeals from a summary judgment entered by the United States District Court for the Eastern District of New York (Charles P. Sifton, Judge) in favor of, inter alios, the defendant Woo. The plaintiffs -- a father and his children -- bring various claims under 42 U.S.C. § 1983 asserting that Woo, a children's services caseworker employed by the defendant City of New York, entered their home unlawfully and effected an unconstitutional removal of the children into state custody. The district court concluded that Woo was entitled to qualified

---

* The Clerk of Court is directed to amend the official caption in accordance with the foregoing.

immunity with respect to all of the claims against him.  We disagree.  As to each claim that has been preserved for appeal:

Vacated and remanded.

MICHAEL G. O'NEILL, New York, N.Y., for Plaintiffs-Appellants Venus S., Sonny B.S. Jr., Nathaniel S., Emmanuel F., Kiam F., and Elizabeth F.

SONNY B. SOUTHERLAND, Brooklyn, N.Y., Plaintiff-Appellant, pro se.

JULIAN L. KALKSTEIN, City of New York (Michael A. Cardozo, Corporation Counsel; Larry A. Sonnenshein, of counsel), New York, N.Y., for Defendants-Appellees.

SACK, Circuit Judge:

This lawsuit involves a man and a woman -- the plaintiff Sonny B. Southerland Sr. ("Southerland") and non-party Diane Manning -- two groups of children, and a caseworker's apparent confusion between the two groups.  Plaintiff Ciara Manning is the daughter of Southerland and Diane Manning.  Ciara was supposed to be living with Southerland at the time in question, but in fact had left to live with a friend.

In addition to Ciara, plaintiff Southerland fathered, by one or more women other than Diane Manning, six other children: the plaintiffs Venus Southerland, Sonny B. Southerland Jr., Nathaniel Southerland, Emmanuel Felix, Kiam Felix, and Elizabeth Felix (together, the "Southerland Children").  At the time of the principal events in question, the Southerland Children, unlike Ciara, were living with their father.

2

Diane Manning also allegedly bore, by one or more men other than Southerland, six children other than Ciara: Eric Anderson, Richy Anderson, Felicia Anderson, Erica Anderson, Michael Manning, and Miracle Manning (together, the "Manning Children"). They lived with Diane and, like her, are not parties to this lawsuit.

In May 1997, the defendant Timothy Woo, a caseworker in the Brooklyn Field Office of the New York City Administration for Children's Services ("ACS"), was assigned to investigate a report by a school counselor about then-sixteen-year-old Ciara Manning. School staff had thought Ciara to be acting strangely at school.

After being unable, despite repeated attempts, to gain entry to the Southerland home to investigate the report, Woo sought and obtained from the Kings County Family Court an order authorizing entry into the apartment. Woo's application to obtain that order contained several misstatements of fact, which suggested Woo's possible confusion about which of the children resided with Southerland.

Under the authority of the Family Court's order, Woo then entered the Southerland apartment. Ciara was not there; some of Southerland's other children who lived with him were. Based on what Woo perceived to be the poor condition of the home and of the Southerland Children, and his other observations from the investigation undertaken to that date, Woo and his supervisor decided to carry out an immediate removal of the children into ACS custody.

Southerland and the Southerland Children brought this action based on Woo's entry into the apartment and removal of the children. They claim that Woo violated their Fourth Amendment[1] rights to be free from unreasonable searches of their home, and that the manner in which the Southerland Children were removed violated their procedural due process rights under the Fourteenth Amendment. Southerland also claims that the removal of the Southerland Children from his home violated his substantive due process rights under the Fourteenth Amendment. Finally, the Southerland Children claim that their removal violated their Fourth Amendment rights to be free from unreasonable seizure.

The district court (Charles P. Sifton, Judge)[2] concluded, inter alia, that Woo was entitled to qualified immunity with respect to all of the claims against him and granted summary judgment in his favor. We disagree with those conclusions and therefore vacate the district court's judgment as to those claims that have been pursued on appeal and remand the matter for further proceedings.

**BACKGROUND**

The relevant facts are rehearsed in detail in the district court's opinion. See Southerland v. City of N.Y., 521

---

[1] We refer throughout this opinion to asserted Fourth Amendment rights of the plaintiffs. Inasmuch as the defendants are state and not federal actors, of course, whatever rights the plaintiffs have are "under the Fourth Amendment, as applied to the States under the Fourteenth Amendment['s]" Due Process Clause. Kia P. v. McIntyre, 235 F.3d 749, 761 (2d Cir. 2000); see Mapp v. Ohio, 367 U.S. 643, 655 (1961).

[2] Judge Sifton passed away while these appeals were pending.

4

F. Supp. 2d 218 (E.D.N.Y. 2007) ("Southerland II").  They are set forth here only insofar as we think it necessary for the reader to understand our resolution of these appeals.  Where the facts are disputed, we construe the evidence in the light most favorable to the plaintiffs, who are the nonmoving parties.  See, e.g., SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).  We also draw all reasonable factual inferences in the plaintiffs' favor.  See, e.g., id.

### The ACS Investigation

On May 29, 1997, a school guidance counselor reported to the New York State Central Registry Child Abuse Hotline that one of the school's students, Ciara Manning, the then-sixteen-year-old daughter of Diane Manning and plaintiff Southerland, was "emotionally unstable."  The counselor further reported:

> Fa[ther] fails to follow through w[ith]
> mental health referrals.  On 5/12/97 the
> ch[ild] swallowed a can of paint.  F[ather]
> failed to take the ch[ild] for medical
> attention.  Fa[ther] is unable to control or
> supervise the ch[ild].  She may be staying
> out of the home in an i[m]proper
> enviro[n]ment.

Intake Report at 3, Office of Children and Family Services, Child Protective Services, May 29, 1997 ("Intake Report"), Ex. A to the Declaration of Janice Casey Silverberg (Dkt. No. 168) ("Silverberg Decl."), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Sept. 18, 2006).  The Intake Report was transmitted to the Brooklyn Field Office of the ACS.  There, Fritz Balan, a supervisor, assigned the case to defendant Timothy Woo, an ACS

5

caseworker, for investigation. Woo, who was required by New York law to begin his investigation within 24 hours, did so that day.

He first examined the files of a case pending in that ACS office regarding Ciara's mother, Diane Manning. Material in those files disclosed that Ciara had several younger half-siblings: the Manning Children. According to Woo, this material also indicated that Ciara lived with her father, Southerland, at a Brooklyn address, although the plaintiffs correctly note the absence of any evidence as to the source of that information and the time it was received. It is not clear from the record whether Woo was aware that the children referenced in Diane Manning's case file were not related to Southerland and that they did not live with him. See Southerland II, 521 F. Supp. 2d at 222, 224 & n.8.

Woo also contacted the school guidance counselor who had called the child-abuse hotline. According to Woo, the counselor told him that while at school, Ciara had swallowed non-toxic paint, expressed thoughts of suicide, and was generally behaving aggressively and "acting out." Declaration of Timothy Woo ¶ 10 (Dkt. No. 169) ("Woo Decl."), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Sept. 18, 2006). Woo's handwritten notes from the conversation indicate that the counselor told Woo that "father [i.e., Southerland] doesn't approve of the place [where Ciara] is staying." Notes of Timothy Woo at 1, Ex. A to the Declaration of Michael G. O'Neill (Dkt. No. 182) ("O'Neill Decl."), Southerland v. City of N.Y., No. 99-

6

cv-3329 (E.D.N.Y. Dec. 28, 2006).  It is disputed whether the counselor also told Woo that Southerland had been unresponsive to the school's stated concerns about Ciara's behavior.

Later that day, Woo attempted to visit Southerland's apartment in Brooklyn where, for reasons that are not clear from the record, Woo thought Ciara was staying.  When no one answered the door, Woo left a note containing his contact information.

The following day, May 30, Southerland telephoned Woo.  During the course of their conversation, Southerland described Ciara as a runaway who would not obey him.  Southerland suggested that he visit the ACS office to discuss the matter with Woo further.  The plaintiffs dispute Woo's assertion that during the phone conversation, Southerland indicated that he would not permit Woo to visit Southerland's apartment.  Southerland contends that, although he did question why Woo needed to visit the apartment since Ciara did not live there, Southerland nonetheless indicated that he would be willing to make an appointment for Woo to conduct a home visit if Woo insisted.

Southerland visited the ACS office and met with Woo later that day.  According to Southerland's deposition testimony, he told Woo that Ciara had run away and that he had obtained several "Persons in Need of Supervision" ("PINS") warrants against her.  Woo's case notes indicate that Woo asked Southerland why he had not sought medical attention for Ciara after the paint-swallowing incident.  Southerland did not answer

7

the question.[3]  See Progress Notes of T. Woo at 1 ("Progress Notes"), Ex. B to O'Neill Decl.

Southerland told Woo and Balan, Woo's supervisor, that Ciara did not need psychiatric help, and that she "'was only acting the way she did to get attention.'"  Southerland II, 521 F. Supp. 2d at 223 (quoting Woo Decl. ¶ 10); see also Declaration of Fritz Balan ¶ 7 (Dkt. No. 170) ("Balan Decl."), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Sept. 18, 2006). According to Woo, he explained to Southerland that various services were available through ACS to assist him and his children, including counseling and help with obtaining food, furniture, and clothing.  Southerland declined.  According to Southerland, however, no such assistance was ever offered.

When Woo said he would need to make a home visit, Southerland replied that it would be "no problem" as long as he was notified in advance.  Southerland II, 521 F. Supp. 2d at 223; see also Deposition of Sonny B. Southerland at 207 ("Southerland Dep."), Ex. F to O'Neill Decl.  Southerland asserts that Woo stated he would call him to arrange the visit, but that Woo never made such a call.

On June 2, 1997, Woo made a second attempt to examine the Southerland apartment.  A woman whose identity was unknown to

---

[3]  Southerland later testified that the school contacted him with a medical referral after the paint-swallowing incident, and that he had tried to get Ciara to go to the appointment that was scheduled for her, but that she refused to go.

Woo answered the door. She said that Southerland was not at home. Woo left.

The following day, June 3, Woo again went to the apartment. He heard noises inside, but no one answered the door. Again, he left.

The next day, June 4, Woo went to the apartment for a fourth time. He waited in the hallway for several minutes. Southerland emerged accompanied by five school-aged children: Sonny Jr., Venus, Emmanuel, Nathaniel, and Kiam. Woo wrote down their names in his case notes. Southerland told Woo that he did not have time to talk because he was taking the children to school. Woo gave Southerland an ACS business card and told him that if he continued to be uncooperative, ACS would seek court action. Southerland II, 521 F. Supp. 2d at 223-24 & n.6; see also Progress Notes at 2.

### The Removal of the Southerland Children

On June 6, 1997, at the direction of supervisor Balan, Woo applied to the Kings County Family Court for an order to enter the Southerland apartment pursuant to section 1034(2) of the New York Family Court Act. It is ACS policy to investigate not only the status of the child named in a report of suspected abuse or maltreatment of the type referred to in section 1034(2), but also that of any other children residing in the same home. Woo listed Ciara on the application. Instead of including the names of the children he had met leaving Southerland's home on June 4, however, he listed the other children of Ciara's mother

9

Diane -- the Manning Children: Eric Anderson, Richy Anderson, Felicia Anderson, Michael Manning, Miracle Manning, and Erica Anderson -- whose names he apparently had obtained from the Diane Manning case files he had reviewed at ACS's Brooklyn Field Office.[4] The Family Court issued an "Order Authorizing Entry" into the Southerland apartment the same day, June 6. See Southerland II, 521 F. Supp. 2d at 224.

Three days later, on the evening of June 9, 1997, pursuant to the Order Authorizing Entry, Woo and another caseworker entered the Southerland apartment with the assistance

---

[4] Woo listed the Manning Children's names at the top of the application, along with Southerland's name and the address of the Southerland apartment. The body of the application states in its entirety:

> I, Timothy Woo, Caseworker for ACS, am a person conducting a child protective investigation pursuant to the Social Services Law. I have reasonable cause to believe that the above named children may be found at the above premises. I have reason to believe that the children are abused or neglected children. The reasons and the sources of information are as follows:
>
> That on May 12, 1997, Sierra [sic] Manning, age 16 tried to kill herself by swallowing non-toxic paint. Mr. Sutherland [sic] did not take Sierra [sic] to a medical doctor and refused to take Sierra [sic] for psychiatric evaluation.
>
> Mr. Sutherland [sic] has refused to allow the Administration for Children's Services into his home to speak to the above named children.
>
> WHEREFORE, the applicant moves for an order authorizing the Administration for Children's Services accompanied by police to enter the premises to determine whether the above named children are present and to proceed thereafter with its child protective investigation.

Application for Authorization to Enter Premises dated June 6, 1997, Ex. C to Silverberg Decl.

10

of officers from the New York City Police Department. Southerland and the Southerland Children were present inside the home. Woo Decl. ¶¶ 13-15, 19. The district court described what happened next, from Woo's perspective:

> Woo determined that there were six children between the ages of three and nine residing in the apartment. He listed their names [correctly] as Venus, Sonny Jr., Nathaniel, Emmanuel, Kiam, and Elizabeth Felix. Soon after beginning his evaluation of the home, Woo called his supervisor [Balan] on his cell phone, described his observations, and answered his supervisor's questions. Woo reported that the four boys slept on the floor in one bedroom and the two girls slept on a cot in another bedroom. The children appeared as though they had not been bathed in days and their clothing was malodorous. In the refrigerator, Woo found only beer, a fruit drink, and English muffins. Woo did not examine the contents of the kitchen cupboards. The other caseworker observed that one child, Venus, was limping because of a foot injury. The child stated that she had stepped on a nail. The caseworker concluded that Southerland had not sought medical attention for her. Woo reported that the only light source in the bedroom area was from a blank television screen. Woo observed an electric lamp on the floor, without a shade, connected to an outlet in the living room by means of several extension cords along the floor. Woo reported that another room contained stacks of electronic equipment. Woo and his supervisor concluded that the children's safety was threatened, and Balan directed Woo to remove the children from the home.

Id. at 224-25 (footnotes omitted).[5]

---

[5] The district court summarized Woo's and Balan's stated reasons for removing the Children as including: the seriousness of the initial allegation in the Intake Report -- that Ciara had attempted suicide; that Southerland had failed to seek medical assistance for Ciara or for Venus; that he had resisted allowing ACS to visit his home; that he had refused to accept ACS services

As the district court also observed, the plaintiffs -- relying primarily on later deposition testimony by Southerland -- offer a starkly different description of the conditions in the Southerland home at the time. According to Southerland's testimony, the apartment did not lack proper bedding; the boys had a bunk bed in their room, although they preferred to sleep on yellow foam sleeping pads on the floor. Id. at 225 n.10. The children were not dirty; Southerland testified that he laundered the children's clothing about once a week and bathed the children daily. Id. at 225 n.11. There was food in the refrigerator, and it is also a reasonable inference from Southerland's testimony that there was food in the cupboards (which Woo did not examine), because Southerland testified that groceries for the household were purchased on a regular basis. Id. at 225 n.12. The household did not lack lighting; Southerland testified that he had a lamp plugged into a wall in each room. Id. at 225 n.14. Finally, although Southerland does not dispute that Venus had a foot injury, the plaintiffs stress Woo's concession that he did not personally observe the injury during his assessment of the home.[6] Id. at 225 n.13.

---

or assistance; that the home lacked food and adequate light; that the use of multiple extension cords for the electronic equipment was dangerous; and that the children were dirty. This combination of factors, according to Woo and Balan, "established in [their] minds that Southerland could not parent the children responsibly." Southerland II, 521 F. Supp. 2d at 225.

[6] After the Southerland Children's removal, Woo brought Venus "to a hospital based on the instructions of a nurse at the agency that first examined the children. At the hospital, the wound was dressed and the child received a tetanus shot."

In the early hours of June 10, 1997, at Balan's direction, Woo removed the Southerland Children from the Southerland home.  Woo took them to the ACS pre-placement emergency shelter and arranged for emergency foster care.  Id. at 226.

At some point -- it is not clear exactly when -- Woo interviewed Ciara Manning, whom he had found living at the home of her friend.  Ciara told Woo that her father had sexually abused her and threatened to kill her if she told anyone about it -- allegations she later recanted.[7]  The Southerland Children also complained of various kinds of abuse and mistreatment at the hands of Southerland and his companion, Vendetta Jones.  These allegations concerning Ciara and the Southerland Children were included in a verified petition filed by ACS with the Family Court on June 13, 1997, and amended on June 27, 1997.  The petitions commenced child-protective proceedings under Article 10 of the New York Family Court Act, §§ 1011 et seq., through which ACS sought to have the Southerland Children adjudicated as abused and neglected.

---

Southerland II, 521 F. Supp. 2d at 225 n.13.

[7] On March 14, 2007, Southerland made a pro se submission to the district court requesting that the court take judicial notice of a number of documents, including a declaration by Ciara Manning that had been sworn on April 20, 2002.  In that declaration, Ciara stated that Southerland had never molested or abused her in any way and that the statements she made previously to Woo and to the Family Court to that effect were false.  See Pro Se Submission of Sonny B. Southerland at 26-27 (Dkt. No. 192), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Mar. 14, 2007).

On July 1, 1998, more than a year after the children were removed from the Southerland home, the Kings County Family Court concluded after a five-day trial that Southerland had engaged in excessive corporal punishment of the Southerland Children and that he had abused and neglected them. The court also concluded that he had sexually abused his daughter Ciara. The court ordered that the Southerland Children remain in foster care, where they had resided since the June 1997 removal. The New York Appellate Division, Second Department, affirmed these orders, see In re Ciara M., 273 A.D.2d 312, 708 N.Y.S.2d 717 (2d Dep't 2000), and the New York Court of Appeals denied leave to appeal, see In re Ciara M., 95 N.Y.2d 767, 740 N.E.2d 653, 717 N.Y.S.2d 547 (2000).

In March 2004, nearly seven years after their removal from the Southerland home, Sonny Jr. and Venus were permitted to return to live with Southerland. Some seven months thereafter, Nathaniel and Emmanuel were discharged from the juvenile justice system by the Office of Children and Family Services and also returned to the Southerland home. As far as we can determine from the record, neither Kiam nor Elizabeth ever returned to live with Southerland.

However strongly the facts of mistreatment found by the Family Court at trial may indicate that Woo's perceptions about the dangers to the Southerland Children of their remaining with Southerland were correct, virtually none of this information was in Woo's possession when he effected the June 9, 1997, entry and

14

removal, as the district court correctly observed.  See Southerland II, 521 F. Supp. 2d at 226 n.19.  These subsequently determined facts therefore do not bear upon our consideration of whether Woo's actions in effecting the removal were constitutional.  See id.

Prior Federal Court Proceedings

In June 1999, some two years after the removal and while the Southerland Children remained in foster care, Southerland, on behalf of himself and his children, filed a pro se complaint in the United States District Court for the Eastern District of New York against more than forty defendants for the allegedly wrongful removal of the Southerland Children from his home.  On February 1, 2000, the district court (Charles P. Sifton, Judge) granted the defendants' motion to dismiss on grounds that included failure to state a claim, failure to plead certain matters with particularity, lack of subject-matter jurisdiction, and Eleventh Amendment immunity.  See Opinion & Order (Dkt. No. 43), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Feb. 2, 2000).

Southerland appealed.  We affirmed in part, reversed in part, and remanded the action.  We ruled, inter alia, that the district court had erred in dismissing Southerland's claims under 42 U.S.C. § 1983 relating to the seizure and removal of the Southerland Children.  See Southerland v. Giuliani, 4 F. App'x 33, 36 (2d Cir. 2001) (summary order) ("Southerland I").  We concluded that the pro se complaint stated valid claims for

15

violations of both the substantive and procedural components of the Fourteenth Amendment's Due Process Clause. See id. at 36-37. We "emphasize[d] that our holding [wa]s limited to the claims made directly by Sonny Southerland," noting that "[a]lthough the children probably have similar claims, we have held that a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." Id. at 37 (citation and internal quotation marks omitted). We therefore "le[ft] it to the district court upon remand to determine whether Southerland should be given a chance to hire a lawyer for his children or to seek to have one appointed for them." Id.

On remand, the district court appointed counsel to represent both Southerland and the Southerland Children.[8] Southerland II, 521 F. Supp. 2d at 227. In November 2002, through counsel, Southerland and the Southerland Children jointly filed an amended complaint, id. at 221 & n.1, asserting nine claims under 42 U.S.C. § 1983 against Woo and the City of New York, id. at 221 n.2.[9]

---

[8] Michael G. O'Neill was appointed as counsel for both Southerland and the Southerland Children. In April 2004, Southerland resumed proceeding pro se before the district court, while Mr. O'Neill continued to represent the Southerland Children (including Venus and Sonny Jr., even after they were no longer minors). In April 2004, the district court also appointed a guardian ad litem to represent the Southerland Children's interests. Southerland II, 521 F. Supp. 2d at 221 n.1. In the instant appeals, Southerland represents himself pro se, while Mr. O'Neill continues to represent the Southerland Children.

[9] The amended complaint did not name as defendants or assert any claims against any of the other thirty-nine defendants that had been named by Southerland in his original pro se complaint. Additionally, although Ciara was identified as a

16

In the amended complaint, Southerland asserts four separate claims against Woo.[10]  First, Southerland alleges an unlawful-search claim, asserting that Woo's entry into his home "without privilege, cause or justification" violated the Fourth Amendment.  Am. Compl. ¶¶ 40-41 (Dkt. No. 75), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Nov. 22, 2002).  Southerland asserts a second Fourth Amendment unlawful-search claim for Woo's remaining in his home even after discovering that the children listed on the Order Authorizing Entry were not there.  Third, Southerland asserts a Fourteenth Amendment procedural due process claim for removal of the Southerland Children from his home without a court order and in the absence of an immediate threat of harm to their lives or health.  Finally, Southerland alleges a substantive due process claim,

---

plaintiff in the original complaint, she was dropped from the suit when the amended complaint was filed.

    [10] The amended complaint also joins nine John Doe defendants, including all persons who "supervis[ed], monitor[ed] and assist[ed] Woo in his actions with respect to the [Southerland] Children."  Am. Compl. ¶ 39 (Dkt. No. 75), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Nov. 22, 2002).  The complaint asserts that "said Does are individually liable to [Southerland] for the deprivation of his constitutional rights and the constitutional rights of the [Southerland] Children as alleged herein."  Id.

    In their briefing on appeal, the plaintiffs do not address these John Doe defendants.  We conclude that the plaintiffs have abandoned their claims against the John Does.  We note that even if the plaintiffs now sought to amend their complaint to identify the John Doe defendants, the claims against the newly named defendants would be time-barred.  See Tapia-Ortiz v. Doe, 171 F.3d 150, 151-52 (2d Cir. 1999) (per curiam); Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 468-70 (2d Cir. 1995), modified, 74 F.3d 1366 (2d Cir. 1996).

17

also under the Fourteenth Amendment, for Woo's removal of the Southerland Children absent a reasonable basis for doing so.

The amended complaint also interposes various claims on behalf of the Southerland Children. First, the Children assert the same procedural due process claim under the Fourteenth Amendment as does Southerland. Second, they assert a substantive due process claim under the Fourteenth Amendment. The district court recharacterized the latter claim as arising under the Fourth Amendment's guarantee of protection against unlawful seizure.[11] See Southerland II, 521 F. Supp. 2d at 230 n.24. Finally, the district court construed the amended complaint as asserting on behalf of the Children the same two Fourth Amendment unlawful-search claims as were asserted by Southerland.

Southerland and the Southerland Children also bring several claims against the City of New York. Southerland asserts that the City is liable under 42 U.S.C. § 1983 for the removal of the Southerland Children insofar as that removal was conducted pursuant to two alleged official City policies: to remove children without a reasonable basis, and to remove children without a court order despite the absence of any immediate threat of harm to their lives or health. Southerland and the Southerland Children also allege that high-ranking policymakers

---

[11] In so doing, the district court relied upon our statement, when the case was previously on appeal, that "[t]he children's claims for unreasonable seizure would proceed under the Fourth Amendment rather than the substantive component of the Due Process Clause." Southerland I, 4 F. App'x at 37 n.2 (citing Kia P. v. McIntyre, 235 F.3d 749, 757-58 (2d Cir. 2000)).

18

within the City's police department knew or should have known that the City's failure to train police officers accompanying ACS employees on home visits and investigations would deprive New York City residents of their constitutional rights.[12]

On the defendants' motion for summary judgment, the district court concluded that Woo was entitled to qualified immunity as to all of the claims against him.  With respect to the Fourth Amendment unlawful-search claims, the court concluded that the false and misleading statements made by Woo in his application for the Order Authorizing Entry did not strip him of qualified immunity because the plaintiffs could not show that these statements were necessary to the finding of probable cause to enter the home.  Southerland II, 521 F. Supp. 2d at 230-31. The court decided that qualified immunity was warranted because "a corrected affidavit specifying all of the information known to Woo establishes an objective basis that would have supported a reasonable caseworker's belief that probable cause existed." Id. at 231 (brackets, citation, and internal quotation marks omitted).

With respect to the Southerland Children's Fourth Amendment unlawful-seizure claim, and the procedural due process claims brought by both sets of plaintiffs, the district court decided that qualified immunity shielded Woo from liability

---

[12] The district court later permitted the Southerland Children to assert their failure-to-train claim against the City not only with respect to the police, but also with respect to ACS.  See Southerland II, 521 F. Supp. 2d at 235 n.34.

19

because his actions pre-dated the clear establishment of law in this context, which in its view did not occur until this Court's decision in Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), cert. denied, 529 U.S. 1098 (2000). See Southerland II, 521 F. Supp. 2d at 231-32.

Lastly, with regard to Southerland's substantive due process claim, the district court concluded that Woo was entitled to qualified immunity because "it was objectively reasonable for [him] to conclude that Southerland's substantive due process rights were not violated" when Woo removed the Southerland Children from the home, because "[b]rief removals of children from their parents generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." Id. at 32 (brackets and internal quotation marks omitted).

Notwithstanding the district court's conclusion that Woo was entitled to qualified immunity as to every claim asserted against him, the court proceeded to consider, in the alternative, the underlying merits of the plaintiffs' various claims. The court decided that even in the absence of immunity, Woo would be entitled to summary judgment with respect to the plaintiffs' Fourth Amendment unlawful-search claims and Southerland's substantive due process claim. Specifically, with respect to the Fourth Amendment unlawful-search claims, the district court decided that "no reasonable juror could infer that Woo knowingly

20

and intentionally made false and misleading statements to the family court in order to receive an order authorizing his entry into the Southerland home." Id. at 233. With respect to Southerland's substantive due process claim, the court concluded that "no reasonable juror could find that the removal of the children from their home in order to verify that they had not been neglected or abused was so 'shocking, arbitrary, and egregious' that Southerland's substantive due process rights were violated." Id. at 234-35 (citation omitted).

The district court concluded that the City was also entitled to summary judgment on all of the claims against it. See Southerland II, 521 F. Supp. 2d at 235-39. The plaintiffs do not appeal from that portion of the judgment and therefore have abandoned their claims against the City. See LoSacco v. City of Middletown, 71 F.3d 88, 92-93 (2d Cir. 1995).

The district court determined, however, that without qualified immunity protection, summary judgment would not be appropriate on the merits of the procedural due process claims brought by both Southerland and the Southerland Children because, "[a]lthough defendants argue that the 'totality of the circumstances' Woo encountered in the Southerland home required an ex parte removal, they fail to explain why there was not sufficient time for Woo to seek a court order removing the children." See Southerland II, 521 F. Supp. 2d at 235 n.31. Nor would summary judgment be appropriate on the merits of the Southerland Children's Fourth Amendment unlawful-seizure claim,

21

the district court said, because the defendants could not explain "why the particular circumstances that Woo encountered in the Southerland home established that there was imminent danger to the children's life or limb requiring removal in the absence of a court order." Id. at 234 n.29.

Both Southerland and the Southerland Children now appeal from the dismissal of each of their claims against Woo, except for one Fourth Amendment claim brought by all plaintiffs. The plaintiffs have not appealed the district court's adverse ruling as to their claim that Woo violated the Fourth Amendment by remaining in their home even after determining that the children listed on the Order Authorizing Entry were not present.

We vacate and remand with respect to each of the plaintiffs' claims that have been preserved for appeal.

**DISCUSSION**

I.   Standard of Review

"We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving part[ies] and drawing all reasonable inferences in [their] favor." Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). "[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir.), cert. denied, 524 U.S. 911 (1998); see Fed. R. Civ. P. 56(a).

22

## II. Qualified Immunity

Qualified immunity shields public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."  Holcomb v. Lykens, 337 F.3d 217, 220 (2d Cir. 2003) (internal quotation marks omitted).  An officer is also entitled to qualified immunity "if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context."  Manganiello v. City of N.Y., 612 F.3d 149, 165 (2d Cir. 2010) (internal quotation marks omitted).

## III. Overview of Constitutional Law in the Context of the State's Removal of Children from Their Home

As we observed in a decision post-dating the events at issue in these appeals, "[p]arents . . . have a constitutionally protected liberty interest in the care, custody and management of their children."  Tenenbaum, 193 F.3d at 593; see also Troxel v. Granville, 530 U.S. 57, 65-66 (2000) (collecting cases concerning the "fundamental right of parents to make decisions concerning the care, custody, and control of their children").  "[C]hildren have a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive

23

from the intimacy of daily family association." <u>Kia P. v. McIntyre</u>, 235 F.3d 749, 759 (2d Cir. 2000) (brackets and internal quotation marks omitted), <u>cert. denied</u>, 534 U.S. 820 (2001); <u>see also</u> <u>Duchesne v. Sugarman</u>, 566 F.2d 817, 825 (2d Cir. 1977) ("Th[e] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children."). The state's removal of a child from his or her parent may give rise to a variety of cognizable constitutional claims.

First, both the parents and the children may have a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process. The Fourteenth Amendment imposes a requirement that except in emergency circumstances, judicial process must be accorded both parent and child before removal of the child from his or her parent's custody may be effected. <u>See, e.g.</u>, <u>Kia P.</u>, 235 F.3d at 759-60; <u>Tenenbaum</u>, 193 F.3d at 593-94; <u>Duchesne</u>, 566 F.2d at 825-26. Both Southerland and the Southerland Children have asserted such a procedural due process claim against Woo in this case.

Second, a parent may also bring suit under a theory of violation of his or her right to substantive due process. Southerland does so here. Parents have a "substantive right under the Due Process Clause to remain together [with their children] without the coercive interference of the awesome power of the state." <u>Tenenbaum</u>, 193 F.3d at 600 (internal quotation marks omitted); <u>see also, e.g.</u>, <u>Anthony v. City of N.Y.</u>, 339 F.3d 129, 142-43 (2d Cir. 2003); <u>Kia P.</u>, 235 F.3d at 757-58. Such a

24

claim can only be sustained if the removal of the child "would have been prohibited by the Constitution even had the [parents] been given all the <u>procedural</u> protections to which they were entitled." <u>Tenenbaum</u>, 193 F.3d at 600 (emphasis in original). In other words, while a procedural due process claim challenges the procedure by which a removal is effected, a substantive due process claim challenges the "fact of [the] removal" itself. <u>Bruker v. City of N.Y.</u>, 92 F. Supp. 2d 257, 266-67 (S.D.N.Y. 2000).

For such claims brought by children, however, we have concluded that the Constitution provides an alternative, more specific source of protection.[13] When a child is taken into state custody, his or her person is "seized" for Fourth Amendment purposes. The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was unreasonable. <u>See</u> <u>Tenenbaum</u>, 193 F.3d at 602. Such a claim belongs only to the child, not to the parent, although a parent has standing to assert it on the child's behalf. <u>Id.</u> at 601 n.13. In accordance with our order in <u>Southerland I</u>, 4 F. App'x at 37 n.2, the district court determined that the Southerland Children's substantive due process claim should be construed

---

[13] "Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." <u>Kia P.</u>, 235 F.3d at 757-58 (quoting <u>Conn v. Gabbert</u>, 526 U.S. 286, 293 (1999)) (brackets and internal quotation marks omitted).

25

instead as a Fourth Amendment unlawful-seizure claim.  See Southerland II, 521 F. Supp. 2d at 230 n.24.

Finally, depending on the circumstances in which a removal occurs, other Fourth Amendment claims might also be viable.  Here, Southerland and the Southerland Children asserted two Fourth Amendment claims for unlawful search: one claim relating to Woo's entry into the Southerland home, and one (now abandoned) claim relating to Woo's remaining in the home even after determining that the Manning Children were not present.  Both claims were based on an allegation that Woo made false statements to the Family Court in order to obtain the Order Authorizing Entry, and therefore that there was no probable cause to carry out a search of the Southerland apartment.

IV.  The Fourth Amendment Unlawful-Search Claims

The district court determined that summary judgment was warranted on the plaintiffs' Fourth Amendment unlawful-search claims on two separate grounds.  First, the district court concluded that Woo was entitled to qualified immunity under the "corrected affidavit" doctrine.  See Southerland II, 521 F. Supp. 2d at 230-31.  Second, the district court decided that Woo was entitled to summary judgment on the merits because no reasonable juror could find that Woo had knowingly made false or misleading statements in seeking to obtain the Order Authorizing Entry.  Id. at 233.  We disagree with both conclusions.

26

## A. The Corrected-Affidavit Doctrine

We begin with the plaintiffs' argument that the district court erred in its application of the corrected-affidavit doctrine, under which a defendant who makes erroneous statements of fact in a search-warrant affidavit is nonetheless entitled to qualified immunity unless the false statements in the affidavit were "necessary to the finding of probable cause." Martinez v. City of Schenectady, 115 F.3d 111, 115 (2d Cir. 1997) (internal quotation marks omitted). In order to determine whether false statements were "necessary to the finding of probable cause," the court must "put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." Id. (citation and internal quotation marks omitted). In applying the corrected-affidavit doctrine, qualified immunity is warranted only if, after correcting for the false or misleading statements, the affidavit accompanying the warrant was sufficient "to support a reasonable officer's belief that probable cause existed." Id. (internal quotation marks omitted).

The district court, which "assum[ed] for purposes of the qualified immunity defense that Woo made false and misleading statements" in applying for the Order Authorizing Entry, Southerland II, 521 F. Supp. 2d at 230, correctly noted that the plaintiffs "would still have to demonstrate that those statements were necessary to the finding of probable cause for qualified

27

immunity not to attach to Woo's actions," id. at 230-31 (citation and internal quotation marks omitted). The court determined that Woo was entitled to qualified immunity based on its conclusion that a corrected affidavit, containing all of the information available to Woo at the time the affidavit was made, would have supported a finding of probable cause to enter the home. Id. at 231.

We disagree. Section 1034(2) of the New York State Family Court Act, which provides the evidentiary standard for a showing of probable cause sufficient for the issuance of an investigative order, governed Woo's application to obtain the Order Authorizing Entry. The district court, in its September 2007 decision, cited the statute as it had been amended in January 2007. See id. at 224 n.7. But the version that governed at the time of Woo's application was materially different. Under the version of the statute that applied at the time of Woo's actions, the affiant was required to demonstrate "probable cause to believe that an abused or neglected child may be found on premises," N.Y. Fam. Ct. Act § 1034(2) (McKinney's 1997) (emphasis added), presumably meaning the "premises" identified in the application submitted to the Family Court.

The district court should have engaged in its corrected-affidavit analysis with reference to the earlier law. The children that Woo listed on his application for the Order Authorizing Entry -- the Manning Children and Ciara -- were children who did not reside "on premises" in the Southerland

28

home.  The district court concluded that "a properly made application would still list Ciara Manning on the application because Southerland is her father and was the parent legally responsible for her care, even if she had run away."  Southerland II, 521 F. Supp. 2d at 231.  That may be relevant to an inquiry under the statute as amended in 2007, but it is not relevant to the appropriate question under the applicable version of the law: whether there existed probable cause for Woo to believe that Ciara Manning could be found "on premises" at the Southerland home.  In fact, she, like the Manning Children, was not "on premises."  And Woo had reason to know that she was not -- from the information in the initial Intake Report transmitted to Woo; from the guidance counselor's statement to Woo that Southerland did not approve of the place where Ciara was staying; and from Southerland's own statements during his May 30 telephone conversation with Woo that Ciara was a runaway and did not live at his home.[14]

---

[14] The defendants also argue, with respect to the probable cause determination, that irrespective of the requirements of New York Family Court Act § 1034(2), Woo was required to visit the Southerland home under a provision of the New York Social Services Law that requires that, within twenty-four hours of receipt of a "report[] of suspected child abuse or maltreatment" as provided for under New York Social Services Law § 424(1), ACS must undertake an investigation that includes "an evaluation of the environment of the child named in the report and any other children in the same home," id. § 424(6)(a).  However, considering that Woo had reason to know that Ciara, the child identified in the report, was not living at the Southerland home -- and, indeed, reason to know that none of the children named in his application to the Family Court were living there -- his reliance on this provision of the Social Services Law fails.  If Ciara was not living "on premises" at the Southerland home, Woo was not entitled to enter the home to evaluate this

29

The plaintiff children point out that there were other deficiencies in the district court's corrected-affidavit analysis that undermine the court's conclusion that the information known to Woo at the time he applied for the Order Authorizing Entry would have supported a finding of probable cause. For example, Woo's application stated that Ciara "tried to kill herself by swallowing non-toxic paint," and that Southerland "did not take [Ciara] to a medical doctor and refused to take [Ciara] for psychiatric evaluation." Application for Authorization to Enter Premises dated June 6, 1997, at 1 ("June 6 Application"), Ex. C to Silverberg Decl. The plaintiff children argue that the application omitted several relevant facts that, according to Southerland's version of events, were known to Woo at that time: that the paint-swallowing incident took place at school, not at home; that Southerland was willing to obtain treatment for his daughter, but had trouble doing so, precisely because she was not living in his home; and that Southerland had attempted to assert control over his daughter by applying for PINS warrants. Southerland Children's Br. at 30-31; see also id. at 28-36 (disputing additional assertions of fact, such as whether the swallowing of paint indeed was a suicide attempt). As the plaintiff children put it:

> Woo's omission of the fact that the incident took place at school allowed the court to assume that the suicide attempt took place in Southerland's residence. The overall picture painted by Woo is that Southerland's daughter

"environment," nor to evaluate the other children living there.

30

attempted to kill herself, that Southerland did nothing about it, and refused to let others do something about it as well. By omitting the fact that the daughter was not even living at the Southerland apartment, Woo gave the family court the impression that it was necessary to allow Woo to enter the apartment in order to render assistance to a suicidal teenager in the home of a parent who could not be bothered to help her and who prevented the efforts of ACS to provide help to her.

Id. at 31-32. The district court included much of this information in its recitation of facts, Southerland II, 521 F. Supp. 2d at 222-23 & nn.4 & 5, but it did not factor these considerations into its application of the corrected-affidavit doctrine.

We have observed that the materiality of a misrepresentation or omission in an application for a search warrant is a mixed question of law and fact.[15] Velardi v. Walsh, 40 F.3d 569, 574 (2d Cir. 1994). "The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law." Id. "[T]he weight that a neutral magistrate would likely have given such information," however, is a question for the factfinder. Id. In such circumstances, a court may grant summary judgment to a defendant based on qualified immunity only where "the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the

---

[15] In child-abuse investigations, a Family Court order is equivalent to a search warrant for Fourth Amendment purposes. See Nicholson v. Scoppetta, 344 F.3d 154, 176 (2d Cir. 2003); Tenenbaum, 193 F.3d at 602.

31

warrant on the basis of the corrected affidavits." Walczyk v. Rio, 496 F.3d 139, 158 (2d Cir. 2007) (emphasis, citation, and internal quotation marks omitted). We cannot conclude as a matter of law -- although a trier of fact might so conclude after an evidentiary hearing -- that the Family Court, in deciding whether there was "probable cause to believe that an abused or neglected child may [have] be[en] found [in the Southerland home]," N.Y. Fam. Ct. Act § 1034(2), would have issued the order had a corrected affidavit been presented to it.

B.    Knowing or Reckless Misstatements of Fact

The district court also concluded that even if the corrected-affidavit doctrine did not apply, summary judgment was appropriate because, on the merits, "no reasonable juror could infer that Woo knowingly and intentionally made false and misleading statements to the family court in order to receive an order authorizing his entry into the Southerland home." Southerland II, 521 F. Supp. 2d at 233. Based on that premise, the district court concluded that "the [O]rder [Authorizing Entry] was issued with probable cause and Woo's entry into and search of Southerland's home did not violate plaintiffs' Fourth Amendment rights." Id.

We disagree. If the district court were correct that Woo did not knowingly make false and misleading statements, that would entitle Woo to qualified immunity, but would not necessarily render his underlying conduct lawful. When a person alleges a Fourth Amendment violation arising from a search

32

executed by a state official, "the issuance of a search warrant . . . creates a presumption that it was objectively reasonable for the [defendant] to believe that the search was supported by probable cause" so as to render the defendant qualifiedly immune from liability. Martinez, 115 F.3d at 115. To defeat the presumption of reasonableness, a plaintiff must make "a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause" for which the warrant was issued. Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991) (internal quotation marks omitted), cert. denied, 505 U.S. 1221 (1992).

We need not consider further whether the district court erred by confusing the qualified immunity and merits analyses, however, because we also do not agree with the district court's premise that no reasonable juror could find that Woo did not knowingly or recklessly make false statements. We think that several disputed facts, taken together and viewed in the light most favorable to the plaintiffs, would permit -- though not require -- a reasonable factfinder to find otherwise.

First, substantial evidence, viewed in the light most favorable to the plaintiffs, suggests that Woo had reason to know that Ciara was not residing at the Southerland home when he applied for the Order Authorizing Entry. For example, the May 29 Intake Report informed ACS that Ciara "may be staying out of the

33

home in an i[m]proper enviro[n]ment." Intake Report at 3. And Southerland told Woo on May 30 that Ciara was a runaway and that he had taken out PINS warrants against her. Southerland II, 521 F. Supp. 2d at 223. A reasonable juror could find that Woo's application to the Family Court on June 6 was knowingly or recklessly misleading in stating: "I have reasonable cause to believe that the above named children [including Ciara] may be found at the above premises [the Southerland home]." June 6 Application at 1.

Second, evidence in the record, again viewed in the light most favorable to the plaintiffs, would permit a reasonable juror to conclude that Woo had knowingly or recklessly misrepresented the nature of the paint-swallowing incident in his application. About one week before June 6, Woo learned from a school counselor that Ciara had "swallowed non-toxic paint at school" and had been "acting out and expressing thoughts of suicide." Woo Decl. ¶ 6. Although the counselor informed Woo that Southerland had failed to seek medical treatment for Ciara, see id., Southerland later explained to Woo that the reason he had not taken Ciara for treatment was that she did not reside with Southerland and did not listen to him, id. ¶ 8. Yet Woo's application represented to the Family Court that Ciara "tried to kill herself by swallowing non-toxic paint" and that Southerland "did not take [her] to a medical doctor and refused to take [her] for psychiatric evaluation." June 6 Application at 1. A reasonable trier of fact might find the foregoing statements to

34

be materially misleading insofar as they characterize Ciara's paint-swallowing as a suicide attempt; fail to note that the incident occurred at school rather than in Southerland's home; and omit the fact that Ciara may have been living outside the home and free from Southerland's control.

Finally, the district court overlooked the parties' dispute concerning Woo's knowledge about which children resided in the Southerland apartment. The district court stated that Woo "had reason to believe that the Manning children would be found in the Southerland apartment because of a separate investigation of the Manning children and his personal observation that there were other children in the Southerland home who had not yet been positively identified." Southerland II, 521 F. Supp. 2d at 233. But, as the district court opinion elsewhere observes, on June 4, 1997 -- two days before he applied for the Order Authorizing Entry -- Woo met the Southerland Children emerging from the Southerland apartment and wrote down their names. See id. at 223-24 & n.6. We think that there is a triable issue of fact as to whether Woo in fact believed, as he wrote in his application to the Family Court, that it was the Manning Children and not the Southerland Children who were in the Southerland home, or whether he recklessly confused or knowingly conflated the two.

Although these alleged misrepresentations may turn out to be no more than accidental misstatements made in haste, the plaintiffs have nonetheless made a "substantial preliminary showing" that Woo knowingly or recklessly made false statements

35

in his application for the Order Authorizing Entry.  Golino, 950 F.2d at 870 (internal quotation marks omitted).  This showing rebuts the presumption of reasonableness that would otherwise apply to shield Woo with qualified immunity at the summary judgment stage.

In sum, because we conclude that genuine issues of material fact exist, both as to whether Woo knowingly or recklessly made false statements in his affidavit to the Family Court and as to whether such false statements were necessary to the court's finding of probable cause, we vacate the district court's grant of summary judgment on the plaintiffs' Fourth Amendment unlawful-search claims.

Once again, we note that a trier of fact might, after review of the evidence, conclude that the errors in the June 6 Application were either accidental or immaterial.  We vacate the grant of summary judgment because we cannot reach that conclusion ourselves on the current record as a matter of law.

V.   The Plaintiffs' Procedural Due Process Claims

Southerland and the Southerland Children each assert a procedural due process claim against Woo.  The district court held that Woo was entitled to qualified immunity on these claims.  We disagree.

A.   Procedural Due Process in the Child-Removal Context

"'As a general rule . . . before parents may be deprived of the care, custody, or management of their children without their consent, due process -- ordinarily a court

36

proceeding resulting in an order permitting removal -- must be accorded to them.'"  Nicholson v. Scoppetta, 344 F.3d 154, 171 (2d Cir. 2003) (quoting Tenenbaum, 193 F.3d at 593).  "However, 'in emergency circumstances, a child may be taken into custody by a responsible State official without court authorization or parental consent.'"  Id. (quoting Tenenbaum, 193 F.3d at 594).  "'If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, ex parte or otherwise, for the child's removal, then the circumstances are not emergent.'"  Id. (quoting Tenenbaum, 193 F.3d at 594).

To prevail, "[t]he government must offer 'objectively reasonable' evidence that harm is imminent."  Id.  Although we have not exhaustively set forth the types of factual circumstances that constitute imminent danger justifying emergency removal as a matter of federal constitutional law, we have concluded that these circumstances include "the peril of sexual abuse," id., the "risk that children will be 'left bereft of care and supervision,'" id. (quoting Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir. 1991)), and "immediate threat[s] to the safety of the child," Hurlman, 927 F.2d at 80 (internal quotation marks omitted); see also N.Y. Fam. Ct. Act § 1024(a) (defining emergency circumstances, for the purposes of state law, as "circumstance[s]" wherein a child's remaining in the parent's care and custody "presents an imminent danger to the child's life or health").

37

B.    Analysis

The district court correctly concluded that summary judgment was not appropriate on the underlying merits of the plaintiffs' procedural due process claims because Woo did not demonstrate, as a matter of law, that he did not have time to obtain a court order authorizing the removal of the Southerland Children before taking that act.  See Southerland II, 521 F. Supp. 2d at 235 n.31 (citing Nicholson, 344 F.3d at 171).  The court nonetheless granted summary judgment on qualified immunity grounds, concluding that "the law concerning procedural due process rights in the context of child removals was not clearly defined at the time of the events in question."  Id. at 232.

But in Hurlman, we recognized that

> officials may remove a child from the custody
> of the parent without consent or a prior
> court order only in "emergency"
> circumstances.  Emergency circumstances mean
> circumstances in which the child is
> immediately threatened with harm, for
> example, where there exists an immediate
> threat to the safety of the child, or where
> the child is left bereft of care and
> supervision, or where there is evidence of
> serious ongoing abuse and the officials have
> reason to fear imminent recurrence.

Hurlman, 927 F.2d at 80 (citations and internal quotation marks omitted); see also Robison v. Via, 821 F.2d 913, 921-22 (2d Cir. 1987) (describing the "'emergency' circumstances" exception and collecting cases).[16]  It thus was clearly established at the time

---

[16]  We disagree with the defendants' assertion that Hurlman and Robison are not controlling here because the state officers in those cases were unlawfully on the premises, whereas Woo had a court order (albeit a disputed one) to enter the Southerland

38

of the Southerland Children's removal that state officials could not remove a child from the custody of a parent without either consent or a prior court order unless "'emergency' circumstances" existed.  Hurlman, 927 F.2d at 80; see also Cecere v. City of N.Y., 967 F.2d 826, 829-30 (2d Cir. 1992) (setting forth "clearly established" procedural due process principles); see also Velez v. Reynolds, 325 F. Supp. 2d 293, 314-15 (S.D.N.Y. 2004) (explaining the principles).

In concluding that the law of procedural due process was not clearly established in the child-removal context in 1997, the district court in the case at bar relied primarily on our decision in Tenenbaum.  There we held as a matter of first impression that "where there is reasonable time consistent with the safety of the child to obtain a judicial order, the 'emergency' removal of a child is unwarranted."  Tenenbaum, 193 F.3d at 596.  Because this principle was not clearly established in 1990 -- the year the underlying conduct at issue in Tenenbaum took place -- we affirmed the district court's decision in that case that the defendants were entitled to qualified immunity.  We also made clear, however, that even in 1990, "it was established as a general matter . . . that 'except where emergency circumstances exist' a parent can 'not be deprived' of the custody of his or her child 'without due process, generally in

home.  Woo's removal of the Southerland Children was without prior judicial authorization.  Although Woo did have a court order to enter the home, then, he did not have an order to remove the Southerland Children from it.  See Southerland II, 521 F. Supp. 2d at 224, 226, 235 n.31.

39

the form of a predeprivation hearing.'"  Id. at 596 (quoting Hurlman, 927 F.2d at 79).

In the present case, the plaintiffs assert "not solely that defendants had sufficient time to obtain a court order, but that the circumstances in which Woo found the children did not warrant their removal at all, whether evaluated by pre- or post-Tenenbaum standards."  Southerland Children's Br. at 39.[17]  We understand the plaintiffs' contention to be that "emergency circumstances" warranting removal simply did not exist.

The district court did not decide as a matter of law that emergency circumstances existed in the Southerland home.  To the contrary, the district court concluded that "[v]iewing the facts in the light most favorable to plaintiffs, a reasonable juror could determine that the circumstances Woo encountered did not demonstrate an imminent danger to the children's life or limb."  Southerland II, 521 F. Supp. 2d at 234 n.29.  The court

---

[17]  In Tenenbaum, a removal was carried out because the child had reported -- albeit under questionable circumstances -- that her father had sexually abused her.  See Tenenbaum, 193 F.3d at 594.  There was no doubt at the time that the possibility of sexual abuse was, as it always is, a serious concern.  At issue was whether there was nonetheless time under the circumstances to secure a court order prior to effecting the removal without risking imminent danger to the child.  See id. at 608 (Jacobs, J., dissenting) (describing majority opinion as holding that, while there was "exigency," there was still no "emergency," because there was time to obtain a court order).  Tenenbaum represented a novel application of procedural due process law because of the majority's holding that regardless of the seriousness of the allegations, it was still necessary to obtain a court order if time permitted.  Here, by contrast, we understand the plaintiffs to assert that the circumstances presented did not necessitate an inquiry into whether there was time to obtain a court order, because the conditions in the Southerland home were not grave enough to trigger that inquiry.

40

further decided that "a reasonable juror could find that there was sufficient time to acquire a court order prior to the removal." Id. at 235 n.31. In light of those determinations, with which we agree, and our assessment that the relevant law was clearly established in 1997, we cannot conclude as a matter of law that "it was objectively reasonable for [Woo] to believe [that his] acts did not violate those [clearly established] rights." Holcomb, 337 F.3d at 220. Qualified immunity therefore is not available to Woo on the plaintiffs' procedural due process claims at the summary judgment stage. Because summary judgment also cannot be granted to the defendants on the underlying merits of these claims,[18] we vacate the grant of summary judgment to Woo as to the procedural due process claims.

VI. Southerland's Substantive Due Process Claim

Southerland asserts a substantive due process claim against Woo under the Fourteenth Amendment. The district court held not only that qualified immunity attached to Woo's actions,

---

[18] The district court correctly noted that there are material factual disputes concerning whether emergency circumstances existed warranting the immediate removal of the Southerland Children from their home. See Southerland II, 521 F. Supp. 2d at 234 n.29 & 235 n.31. But even where emergency circumstances warranting removal exist, "'the constitutional requirements of notice and opportunity to be heard are not eliminated but merely postponed.'" Kia P., 235 F.3d at 760 (quoting Duchesne, 566 F.2d at 826). Therefore, a plaintiff may have a viable claim for violation of procedural due process even where emergency circumstances existed at the time of removal, if the plaintiff does not receive a timely and adequate post-deprivation hearing. See id. at 760-61. In this case, as will be explained below, important factual questions remain concerning the post-removal judicial confirmation proceedings, if any, that took place in the days after the Southerland Children's removal from their home.

41

but also that summary judgment would be warranted on the merits even in the absence of qualified immunity.  We disagree with both conclusions.

A.   Substantive Due Process in the Child-Removal Context

Substantive due process guards a person's rights "against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'"  Tenenbaum, 193 F.3d at 600 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).  "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting Lewis, 523 U.S. at 847 n.8).  The interference with the plaintiff's protected right must be "'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'"  Anthony, 339 F.3d at 143 (quoting Tenenbaum, 193 F.3d at 600); see also Lewis, 523 U.S. at 840 (doctrine of substantive due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them" (internal quotation marks omitted)).  Thus, in the child-removal context, we ask whether "the removal . . . would have been prohibited by the Constitution even had the [plaintiffs] been given all the procedural protections to

42

which they were entitled." Tenenbaum, 193 F.3d at 600 (emphasis omitted).

We have long recognized that parents have a "constitutionally protected liberty interest in the care, custody and management of their children," id. at 593, and that the deprivation of this interest is actionable under a theory of substantive due process, see id. at 600 (recognizing a "substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state'" (quoting Duchesne, 566 F.2d at 825)). We have also observed, however, that "[a]lthough parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." Wilkinson ex rel. Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir. 1999) (internal quotation marks omitted), cert. denied, 528 U.S. 1155 (2000).

We have explained that, in part because the law contemplates a careful balancing of interests, a parent's substantive constitutional rights are not infringed if a caseworker, in effecting a removal of a child from the parent's home, has a reasonable basis for thinking that a child is abused or neglected. See id. "This Circuit has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An

43

investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." Id.; see also id. at 108 (concluding that the "reasonable basis test" requires that caseworkers' decisions to substantiate an allegation of child abuse "be consistent with some significant portion of the evidence before them"). We have applied this "reasonable basis" standard from time to time in recent years. See, e.g., Nicholson, 344 F.3d at 174; Phifer v. City of N.Y., 289 F.3d 49, 60 (2d Cir. 2002); Kia P., 235 F.3d at 758-59.

We have also recognized that substantive due process claims in the child-removal context have a temporal dimension. Because state interference with a plaintiff's liberty interest must be severe before it rises to the level of a substantive constitutional violation, see, e.g., Anthony, 339 F.3d at 143, "brief removals [of a child from a parent's home] generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal," Nicholson, 344 F.3d at 172 (citing Tenenbaum, 193 F.3d at 600-01 & n.12); see also Cecere, 967 F.2d at 830 (ruling that plaintiff's due process claim failed because a "brief" four-day removal, executed "in the face of a reasonably perceived emergency," did not violate due process); Joyner ex rel. Lowry v. Dumpson, 712 F.2d 770, 779 (2d Cir. 1983) (no substantive violation where temporary transfer of custody to foster-care

44

system did not "result in parents' wholesale relinquishment of their right to rear their children").

B.   Analysis

The district court, in deciding that qualified immunity protection prevailed, concluded that it was objectively reasonable for Woo to think that Southerland's substantive due process rights were not being violated because "[b]rief removals of children from their parents generally do not rise to the level of a substantive due process violation," Southerland II, 521 F. Supp. 2d at 232 (brackets and internal quotation marks omitted), and because the Southerland Children "were removed in the context of a child protective investigation [in which] removal would be subject to court confirmation," id.; see also id. at 234 (suggesting that "a family court judge confirmed the removal" at a "timely post-deprivation hearing").

We agree in principle.  The removal of a child from his or her parent does not violate the parent's substantive due process rights if a post-removal judicial proceeding is promptly held to confirm that there exists a reasonable basis for the removal.  The period of time in which the child and parent are separated at the sole instruction of the defendant is, in such a case, not severe enough to constitute a substantive due process violation by the defendant.  See Nicholson, 344 F.3d at 172; Tenenbaum, 193 F.3d at 600-01.  If it were clear in the record that the removal of the Southerland Children was confirmed by a prompt and adequate judicial confirmation proceeding, we would

45

agree with the district court that summary judgment would be appropriate on that basis.

But the record is not sufficiently clear for us to determine whether such a post-removal judicial proceeding occurred, and if so, the nature of it. The district court stated that the Southerland Children were removed and held in ACS custody "pending a timely post-deprivation hearing where a family court judge confirmed the removal." Southerland II, 521 F. Supp. 2d at 234. And the court had previously observed that the Southerland Children "remained in custody without a court order until the morning of June 12, 1997" -- about forty-eight hours -- "at which time Woo obtained a court order confirming the removal." Southerland v. City of N.Y., No. 99-cv-3329, 2006 WL 2224432, at *1, 2006 U.S. Dist. LEXIS 53582, at *4 (E.D.N.Y. Aug. 2, 2006). Although the parties do not appear to dispute that a post-removal judicial confirmation proceeding was held, nor do they dispute that this proceeding took place within several days after removal, they provide no further detail upon which we can assess the nature of the proceeding in terms of its timeliness and adequacy.[19]

---

[19] See Southerland Children's Br. at 23 ("The children were held by the defendants without court order from June 9 until June 13, 1997. ACS filed a petition in the Family Court on June 13, 1997, and apparently some kind of proceeding was held on that day, although there is no evidence of it in the record."); Appellees' Br. at 19 ("Plaintiff Southerland's children, the Court found, were removed from the home and held in ACS custody pending a timely post-deprivation hearing where a family court judge confirmed the removal."). The parties have failed to brief the issue despite our prior instruction that Southerland "be given an opportunity to prove . . . that the subsequent family

46

We are also unable to determine from the present record on what factual basis the Family Court decided that the continued removal of the Southerland Children was warranted.  We do not know, for example, whether its decision to confirm the removal was based solely on written submissions by Woo to the same effect and containing the same errors as Woo's application for the Order Authorizing Entry.

Apparently relying on the understanding that the Family Court had promptly confirmed the Southerland Children's removal, the district court concluded that no reasonable trier of fact could find that the removal of the Children was "so 'shocking, arbitrary, and egregious' that Southerland's substantive due process rights were violated."  Southerland II, 521 F. Supp. 2d at 235 (citation omitted).  For much the same reason that we conclude that material questions of fact preclude summary judgment on the merits of the plaintiffs' procedural due process claims, however, we conclude that summary judgment was inappropriate on the merits of Southerland's substantive due process claim.

A plaintiff's substantive due process claim fails if "there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety."  Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996).  Although this "reasonable basis" standard appears to

court proceedings were insufficiently prompt to pass constitutional muster."  Southerland I, 4 F. App'x at 36.

impose a lesser burden on a defendant than the "emergency circumstances" standard applicable to procedural due process claims, summary judgment is nevertheless not appropriate unless "there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico, 132 F.3d at 149.

The facts concerning the nature of Southerland's behavior during Woo's investigation and the conditions in the Southerland apartment at the time that Woo effected the removal remain hotly contested by the parties. For example, while Woo contends that the apartment lacked enough food, lighting, and bedding; that the Children were malodorous; and that various safety hazards were present, Southerland has tendered admissible evidence (albeit largely in the form of his own testimony) that each of those factual assertions is false. If the trier of fact were to credit Southerland's account, we cannot say that it would be unreasonable for it to then conclude that a reasonable caseworker in Woo's position lacked an "objectively reasonable basis" for removing the Children, Gottlieb, 84 F.3d at 518, and thus that Woo's actions were "shocking, arbitrary, and egregious," Anthony, 339 F.3d at 143 (internal quotation marks omitted). Moreover, in the absence of record evidence as to the substance of the post-removal judicial confirmation proceeding, we cannot conclude that the fact that the Family Court confirmed the removal of the Southerland Children suffices to show that

48

Woo's conduct had an objectively reasonable basis.  Cf. Southerland II, 521 F. Supp. 2d at 234-35.

Finally, we consider whether Woo is nonetheless entitled to summary judgment on the basis of qualified immunity. As noted, qualified immunity is available to defendants "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow, 457 U.S. at 818; see also Cornejo v. Bell, 592 F.3d 121, 128 (2d Cir.), cert. denied, 131 S. Ct. 158 (2010). When a defendant official invokes qualified immunity as a basis for summary judgment, a court must consider not only whether evidence in the record suggests a violation of a statutory or constitutional right, but also "whether that right was clearly established at the time of the alleged violation."  Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010).  Thus, if it could be shown that, at the time of the events in question, Woo lacked a legal basis upon which he could conclude that his actions would violate Southerland's substantive due process rights, Woo would be entitled to qualified immunity.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer [in the position of the defendant] that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).  In answering that question, we consider: "(1) whether the right was

49

defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." Scott v. Fischer, 616 F.3d 100, 105 (2d Cir. 2010). "The task of framing the right at issue with some precision is critical in determining whether that particular right was clearly established at the time of the defendants' alleged violation." Redd v. Wright, 597 F.3d 532, 536 (2d Cir. 2010); see also Wilson v. Layne, 526 U.S. 603, 609 (1999). Although the matter of whether a right at issue is clearly established is a question of law, Higazy v. Templeton, 505 F.3d 161, 170 (2d Cir. 2007), that question is "tied to the specific facts and context of the case," Gilles v. Repicky, 511 F.3d 239, 244 (2d Cir. 2007).

In 1997, when Woo effected the removal, it was well established as a general matter that parents possess a substantive right under the Due Process Clause of the Fourteenth Amendment to exercise care, custody, and control over their children. See, e.g., Santosky v. Kramer, 455 U.S. 745, 753 (1982); Gottlieb, 84 F.3d at 518; Joyner ex rel. Lowry, 712 F.2d at 777. It was also the law, however, that where "parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parents' custody at least pending investigation." Gottlieb, 84 F.3d at 518; see also Stanley v. Illinois, 405 U.S. 645, 649-53 (1972);

50

_Croft v. Westmoreland County Children & Youth Servs._, 103 F.3d 1123, 1125 (3d Cir. 1997).

We therefore determined prior to 1997 that where the state has an "objectively reasonable basis" for removing a child from his or her parent, the parent's substantive constitutional rights are not infringed. _Gottlieb_, 84 F.3d at 518; _see generally id._ at 520; _van Emrik v. Chemung County Dep't of Soc. Servs._, 911 F.2d 863, 866 (2d Cir. 1990). We also repeatedly assured potential defendants that qualified immunity would be available to "protect state officials in choosing between [difficult] alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it." _van Emrik_, 911 F.2d at 866; _see also Defore v. Premore_, 86 F.3d 48, 50 (2d Cir. 1996) (per curiam) (qualified immunity exists to "insure that publicly employed caseworkers have adequate latitude to exercise their professional judgment in matters of child welfare").

In 1999, two years after the events in question here, we summarized the state of the law in _Wilkinson_: "Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the 'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" _Wilkinson_, 182 F.3d at 104 (quoting _Manzano v. S.D. Dep't of Soc. Servs._, 60 F.3d 505, 510 (8th Cir. 1995) (internal quotation

51

marks omitted)). We observed that "[t]he difficulty of balancing the weighty interests apparent in the [child] abuse context . . . has prompted courts to impose few concrete restrictions on case workers, in exercising their discretion, short of [certain] obvious extremes." Id. We described those "extremes" as including circumstances where a caseworker "ignor[es] overwhelming exculpatory information" or "manufactur[es] false evidence." Id. We concluded in dicta that our decisions to that date had left the defendants at bar "with little or no indication that their alleged misconduct, as near as it was to the constitutional borderline, would have even implicated serious constitutional concerns." Id. at 107; see also Patel v. Searles, 305 F.3d 130, 139 (2d Cir. 2002), cert. denied, 538 U.S. 907 (2003). Our discussion in Wilkinson would seem to suggest that perhaps there was a lack of clearly established law available to guide Woo's conduct.

We nonetheless cannot conclude as a matter of law that, in 1997, Woo lacked sufficient legal guidance by which to discern the lawfulness of his actions. Assuming, as we must at the summary judgment stage, that the factual circumstances are as Southerland, not Woo, describes them, and resolving all credibility questions and drawing all reasonable inferences in Southerland's favor, we are not able to say that Woo would then have lacked a legal basis for understanding that removing the children from their home would be unlawful. Indeed, the district court here was also of the view that "Southerland's substantive

52

due process rights were clearly established at the time of the removal of the children."  Southerland II, 521 F. Supp. 2d at 232.

We therefore cannot conclude on this record that the principles of law applicable to the facts as we must view them on appeal from a grant of summary judgment were not clearly established in 1997.  Woo is thus not entitled at this stage to qualified immunity on Southerland's substantive due process claim, although, again, once the relevant disputes of material fact are resolved, the district court might eventually conclude that Woo is entitled to such immunity.

VII. The Southerland Children's Fourth
Amendment Unlawful-Seizure Claim

Finally, the Southerland Children assert a claim for violation of their own substantive due process rights, which the district court recharacterized as a claim of unlawful seizure under the Fourth Amendment.  See Southerland II, 521 F. Supp. 2d at 227 n.22, 230 n.24.  The district court concluded that Woo was entitled to qualified immunity because "prior to the Court of Appeals' decision in Tenenbaum [in 1999], there was no clear application of Fourth Amendment standards in the child removal context."  Id. at 231.  Although we agree with the district court's observation that this Circuit had not yet applied Fourth Amendment unlawful-seizure principles in the child-removal context by 1997, we think that the district court erred by conducting its inquiry solely by reference to the Fourth Amendment.

53

Our decision in Tenenbaum effected a change in the legal framework applicable to a child's claim for substantive constitutional violations arising out of the child's removal from his or her parent's home.  There, the plaintiffs contended that "[their daughter's] temporary removal for the purpose of subjecting her to a medical examination violated their and [the daughter's] substantive due-process rights."  Tenenbaum, 193 F.3d at 599.  Relying on Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.), we observed that

> where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.

Tenenbaum, 193 F.3d at 599 (brackets and internal quotation marks omitted).  We said that "'[s]ubstantive due process analysis is . . . inappropriate . . . if [the] claim is covered by the Fourth Amendment.'"  Id. at 600 (quoting Lewis, 523 U.S. at 843) (second brackets in original; other internal quotation marks omitted).  We then concluded that the daughter's "removal and her examination constituted a seizure and search, respectively, under the Fourth Amendment," id., and that her claim "therefore 'must be analyzed under the standard appropriate to [the Fourth Amendment], not under the rubric of substantive due process.'"[20]

_____

[20] We reaffirmed this approach in Kia P., 235 F.3d at 757-58, where we also construed a child's claimed violation of substantive due process as instead arising under the Fourth Amendment.  In Southerland I, we relied on Kia P. in stating that "[t]he [Southerland] children's claims for unreasonable seizure

54

Id. (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)).

The fact that Tenenbaum changed the legal "rubric" applicable to the Southerland Children's constitutional claims, however, is not determinative of whether their rights were clearly established in 1997. It would be inappropriate, we think, to afford Woo qualified immunity on the Southerland Children's claims solely because, two years after the events in question, we shifted the constitutional framework for evaluating those claims from the Fourteenth to the Fourth Amendment.

We reached a similar conclusion in Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir.), cert. denied, 552 U.S. 818 (2007). There we made clear that the constitutional "right to be free from prolonged detention caused by law enforcement officials' mishandling or suppression of exculpatory evidence," id. at 211, was a species of the right to be free from unlawful seizure under the Fourth Amendment, not a substantive due process right under the Fourteenth Amendment, see id. at 208-09. In then proceeding to undertake a qualified immunity inquiry, we cautioned that our "clarification [of the law was] of no consequence to the question of whether the right was clearly established [at the time of the relevant events], because the proper inquiry is whether the right itself -- rather than its source -- is clearly established." Id. at 212 (collecting cases;

would proceed under the Fourth Amendment rather than the substantive component of the Due Process Clause." Southerland I, 4 F. App'x at 37 n.2.

55

emphasis in original).  Here, as in Russo, in inquiring whether there was clearly established law to govern the Southerland Children's claims in 1997, we look not only to authorities interpreting the Fourth Amendment, but to all decisions concerning the same substantive right.

At the time of the events in question in this case, a child's claim for violation of his or her right to "preservation of family integrity," Duchesne, 566 F.2d at 825, would likely have been understood to arise under the substantive due process guarantee of the Fourteenth Amendment.  This right had been recognized in our case law by 1997, see Joyner ex rel. Lowry, 712 F.2d at 777-78; Rivera v. Marcus, 696 F.2d 1016, 1026 (2d Cir. 1982); Leonhard v. United States, 633 F.2d 599, 618 (2d Cir. 1980) (collecting cases); Duchesne, 566 F.2d at 825, although it had been less frequently litigated than the corresponding substantive parental right.

As with the corresponding parental right, however, the law in 1997 also recognized the countervailing principle that the state may remove children from the custody of their parents without violating the children's constitutional rights where there is a reasonable basis for concluding that the children are abused or neglected.  See, e.g., Rivera, 696 F.2d at 1017.

For much the same reason that we determined that Woo is not entitled to qualified immunity as a matter of law on the current record as to Southerland's substantive due process claim, resolving all disputed facts in the plaintiffs' favor for these

56

purposes, we conclude that a reasonable caseworker in Woo's position would not have lacked a sufficient legal basis for knowing that his conduct under those circumstances would infringe upon the substantive constitutional rights of the Southerland Children. As with the other claims addressed in these appeals, though, the district court may yet conclude on remand and after further development of the facts that Woo is entitled to qualified immunity in this context.

Finally, we note that the district court concluded that, in the absence of qualified immunity protection, Woo would not be entitled to summary judgment on the merits of the Southerland Children's Fourth Amendment unlawful-seizure claim. See Southerland II, 521 F. Supp. 2d at 234 n.29. We have no reason to disturb that ruling on appeal.

**CONCLUSION**

For the foregoing reasons, we vacate the district court's grant of summary judgment on each of the plaintiffs' claims that have been preserved for appeal: (1) Southerland's and the Southerland Children's claims for Fourth Amendment violations arising out of the allegedly unlawful search of the Southerland home; (2) Southerland's and the Southerland Children's claims for violations of procedural due process under the Fourteenth Amendment; (3) Southerland's claim for violation of substantive due process under the Fourteenth Amendment; and (4) the Southerland Children's claim for unlawful seizure under the Fourth Amendment. We remand for further proceedings.